**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALAN GIANA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ALIBABA GROUP HOLDING, LTD.; ALIPAY LABS (SINGAPORE) PTE. LTD.; ALIEXPRESS E-COMMERCE ONE PTE. LTD.; and ALIBABA.COM SINGAPORE E-COMMERCE ONE PTE. LTD.<br><br>Defendants. | Case No. 26-4966 |

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR SYSTEMATIC VIOLATIONS OF THE COPYRIGHT ACT AND RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

## TABLE OF CONTENTS


TABLE OF CONTENTS ..... I

PRELIMINARY STATEMENT ..... 1

JURISDICTION AND VENUE ..... 9

PARTIES ..... 12

ALIBABA'S COPYRIGHT INFRINGEMENT SCHEME ..... 14

I. ALIBABA'S HISTORY, BUSINESS MODEL, AND RELATIONSHIP TO ITS SUPPLIERS ..... 14

II. REPORTING OF ALIBABA'S REGULAR PRACTICE OF COPYRIGHT INFRINGEMENT ..... 18

III. ALIBABA'S DIRECT COPYRIGHT INFRINGEMENT PRACTICES ..... 21

IV. ALIBABA'S CONTRIBUTORY COPYRIGHT INFRINGEMENT PRACTICES ..... 25

V. ALIBABA'S VICARIOUS COPYRIGHT INFRINGING PRACTICES ..... 29

PLAINTIFF'S FACTS ..... 33

ALIBABA'S RICO COPYRIGHT CONSPIRACY ..... 42

I. ALIBABA'S RICO ENTERPRISE ..... 42

II. ALIBABA'S RACKETEERING ACTS ..... 45

A. Systematic Criminal Copyright Infringement, Pirating, Plagiarism, or Counterfeiting ..... 45

B. Wire Fraud ..... 47

CLASS ACTION ALLEGATIONS ..... 49

EFFECTS ON INTERSTATE COMMERCE ..... 57

FIRST CAUSE OF ACTION ..... 58

SECOND CAUSE OF ACTION ..... 59

THIRD CAUSE OF ACTION ..... 61

FOURTH CAUSE OF ACTION ..... 64

FIFTH CAUSE OF ACTION ..... 66

PRAYER FOR RELIEF ....................................................................................................67

DEMAND FOR JURY TRIAL ......................................................................................68

Plaintiff Alan Giana ("Mr. Giana" or "Plaintiff") brings this class action, on behalf of himself and all others similarly situated, against Defendants Alibaba Group Holding, Ltd., ("Alibaba Group"), Alipay Labs (Singapore) Pte. Ltd., AliExpress E-Commerce One Pte. Ltd., and Alibaba.com Singapore E-Commerce One Pte. Ltd. (collectively, "Alibaba," "Alibaba Defendants," or "Defendants"). Plaintiff states these allegations based on personal knowledge as to the facts pertaining to himself, investigation of counsel, and information and belief.

## PRELIMINARY STATEMENT

1. At the heart of this class action is Alibaba's willful, intentional, and systematic infringement of copyrights held by Mr. Giana and the Class (as defined below).

2. Alibaba is a Chinese-owned conglomerate engaging in a variety of businesses, including, without limitation, direct-to-consumer e-commerce sales. American consumers recognize Alibaba as e-commerce websites and applications ("app" or "apps"), where one can purchase products across a range of categories, including, without limitation, electronics, fashion, home goods, beauty, and other products, services, or tools.

3. Just in 2025, Alibaba had annual revenue of approximately $136,400,000,000.[1]

4. One of Alibaba's e-commerce websites and apps is AliExpress, which was launched in 2010 and "is a leading global retail e-commerce platform enabling consumers to buy directly from manufacturers around the world."[2]

5. AliExpress and Alibaba's other e-commerce websites and apps, including, without limitation, Alibaba.com, operate as online marketplaces where consumers are connected directly to Alibaba itself and/or Alibaba suppliers, manufacturers, merchants, or sellers. These Alibaba suppliers, manufacturers, merchants, or sellers are generally referred to herein as "Alibaba suppliers" or "suppliers[.]"

6. Consumers and customers do not use AliExpress, Alibaba, or other Alibaba e-

---

[1] Alibaba Group Profile, Forbes.com, https://www.forbes.com/companies/alibaba-group/ (last visited June 2, 2026).

[2] AliExpress Information Page, https://www.alibabagroup.com/en-US/about-alibaba-businesses-1747705938191581184 (last visited June 2, 2026).

commerce websites or apps to merely connect with any specific Alibaba supplier. Instead, consumers and customers visit Alibaba's e-commerce shops to buy from Alibaba. While there may be an Alibaba supplier involved in the transaction, the sales interface, display of products, services, or tools, and payments made for said products, services, or tools are under Alibaba's control and discretion.

7. And there are sales made by Alibaba itself.

8. Alibaba is similar to a department store. Under one brand, Alibaba's brand, Alibaba brings together Alibaba suppliers under the umbrella of Alibaba's e-commerce websites and apps and offers their products to consumers or customers, all the while managing the process, controlling product flow, processing payments, maintaining the sales infrastructure necessary to effectuate sales, and ultimately profiting off of each and every transaction on Alibaba's platform. An analogous scenario is if a consumer is going to shop at Target, that consumer does not say that "I'm headed to Nike," when they mean that they are going to Target to buy Nike shoes. The same is true for Alibaba: consumers or customers are not visiting Alibaba because of the suppliers; they are visiting because Alibaba itself is offering for sale the products, services, or tools of their suppliers—or of Alibaba itself.

9. Alibaba provides suppliers a variety of tools, including, without limitation, artificial intelligence ("AI") and other automated tools, to enhance their online stores when they sign-up to sell products through an Alibaba e-commerce website or app.[3] For example, for U.S. based suppliers, AliExpress recently rolled out a new suite of tools, including, without limitation, AI-enabled image tools that allow suppliers to upload photos, for which Alibaba's tools will automatically resize and prepare the images for presentation on AliExpress, expanded integration partnerships, the AliExpress Labeling Service, and co-marketing opportunities through AliExpress's Brand+ channel.[4]

[3] *AliExpress Terms of Use for AliExpress AI services for Sellers*, https://rule.aliexpress.com/rule-channels/49971998/209052311 (last visited June 2, 2026).

[4] *AliExpress Unveils Powerful New Tools for U.S. Sellers to Boost Growth and Efficiency*, PR Newswire, Nov. 11, 2025, https://www.prnewswire.com/news-releases/aliexpress-unveils-

10. Alibaba's direct-to-consumer e-commerce business is dependent, in part, on the success of the Alibaba partner-suppliers. When suppliers offer products through Alibaba, they are required to pay Alibaba certain fees on every transaction. Generally, these fees fall into two categories, product commission fees or transaction fees. Alibaba sets the commission fees based on the type of product sold. For example, "Home Appliances" bear a product commission rate of 2.5%, while "Office and School Supplies" bear a product commission rate of 6.0%.[5] Commission fees range generally from 2.5% to 8.0%.[6] Transaction fees are set at the rate of 2.5% for most products.[7]

11. In promoting itself and its e-commerce business, Alibaba proclaims that it operates on a values-based system, one of which being trust: "Trust is both the most precious and fragile thing in the world. The story of Alibaba is a story of building and cherishing trust."[8]

12. But these self-proclaimed values do not embrace reality.

13. Alibaba itself directly infringes copyrights. It markets, offers, and sells products that infringe Class members' copyrights.

14. The direct copyright infringement does not stop there.

15. When a user is perusing Alibaba, Alibaba generates the thumbnail and other images that a user sees when looking at the products available from Alibaba. To generate those images, Alibaba displays the images copied onto its servers, including, without limitation, those that contain infringing works. The copyright holders' interests in these works are infringed when copied onto Alibaba's servers or on a server that Alibaba maintains for such a purpose. Further, Alibaba then displays those unlawfully copied and infringed copyrighted works on its e-commerce

---

powerful-new-tools-for-us-sellers-to-boost-growth-and-efficiency-302611764.html (last visited June 2, 2026).

[5] AliExpress Rules for U.S. Platform Seller, https://rule.aliexpress.com/rule-channels/49971998/175568188 (last visited June 2, 2026).

[6] *Id.*

[7] *Id.*

[8] Alibaba Group Holding Limited Fiscal Year 2024 Annual Report, https://data.alibabagroup.com/ecms-files/1514443390/5788a02d-696c-412a-ad2a-386d19b21769/Alibaba%20Group%20Holding%20Limited%20Fiscal%20Year%202024%20Annual%20Report.pdf, p. 5 (last visited June 2, 2026).

websites or apps in the United States, thus displaying copyrighted works impermissibly without the authorization, license, or payment to the copyright holders.

16. And within Alibaba's suite of companies is an entity called Alipay (defined below), which is a payment processor. Alipay is the payment processor for the vast majority of transactions occurring on Alibaba's e-commerce websites and apps. Without the integration of Alipay, Alibaba would not be able to process the sales transactions occurring on its platform. The use of Alipay is not free, and as alleged herein, not only does Alibaba assess product-related fees, but Alibaba also imposes transaction fees on Alibaba suppliers for use of Alipays' payment-processing services. Infringing products sold through Alibaba's e-commerce websites and Apps that use Alipay lines the pockets of Alibaba and enables the transactions.

17. Further supporting examples that Alibaba is directly involved in copyright infringement, Alibaba actively sanctions or endorses Alibaba suppliers' sales of infringing products through each of Alibaba's Choice, Service, and Verified commitments. Products, listings, or suppliers labeled with Alibaba's Choice, Service, or Verified commitments or badges are designated by Alibaba itself to give consumers assurances about product, listing, and supplier legitimacy. Alibaba goes far enough to assure consumers that for its Choice, Service, or Verified suppliers, Alibaba has undergone a strict inspection process, including, without limitation, vetting suppliers' intellectual-property rights. Products that infringe Class members' copyrights but yet are selected by Alibaba with Alibaba's Choice, Service, or Verified commitments or badges reflect Alibaba's direct involvement in the infringing posting or sale, especially where Alibaba directly earns money from these sales through at the least, the commission fees alleged herein—or in addition to direct infringement or in the alternative, this reflects Alibaba's contributory and/or vicarious infringement.

18. In addition to Alibaba's alleged direct copyright infringement, Alibaba also turns a blind eye and fails to moderate blatant copyright infringement of Alibaba suppliers on Alibaba's e-commerce websites and apps, despite having the means, opportunity, and control over its e-commerce websites and apps to do so.

19. Facially, it appears that Alibaba has implemented a robust copyright-holder notice program and stiff penalties for noncompliance; however, the devil is in the details of how Alibaba's enforcement and penalty program works—and more accurately, how it is expressly designed and in practice works to condone and facilitate copyright infringement.

20. Instead of effectively combating copyright infringement, Alibaba's purported enforcement and penalty program actively fosters copyright-infringement prevalence on Alibaba's e-commerce websites and apps.

21. For example, A review of AliExpress' own copyright-infringement-points policy shows that Alibaba condones and facilitates copyright infringement.

22. It is Alibaba's policy that for the first instance of copyright infringement, "no penalty point [is] incurred for the first violation."[9]

23. Second, for each successive violation, suppliers can potentially earn penalty points, including "6 penalty points incurred for each repeat violation."

24. Third, it is not until a merchant incurs 48 penalty points that Alibaba will terminate the suppliers' account. While Alibaba imposes other penalties for penalty-point accrual, it is only after 48 penalty points that a merchant's account will be terminated.

25. Fourth, Alibaba informs suppliers that "[a]ll general violations and copyright infringements including rights holders' complaints (which include circumstances where a complaint is filed but no counter-notice is submitted by the seller within the specified time limit, or where the counter-notice submitted by the user is rejected) and random checks by AliExpress within three days shall be counted as one serious violation only."

26. Fifth, Alibaba only records violations for 365 days from the date of the penalty imposed and has no such tracking mechanism for account termination within its "Update of Enforcement Actions for Intellectual Property Rights."

27. While Alibaba may take other actions for "serious violations[,]" what constitutes a "serious violation" appears to be largely undefined and within the discretion of Alibaba.

---

[9] The policy is cited *infra.*

28. Alibaba's copyright infringement policies and procedures can be summarized as follows: (1) Alibaba supposedly performs "random" checks of its e-commerce suppliers to determine whether there is any offending conduct; (2) Alibaba offers copyright holders a complaint portal to submit disputes regarding products that violate their copyrights; and (3) Alibaba takes action against suppliers for copyright infringement, but Alibaba only takes action after repeated instances—at least eight separate times—of copyright infringement and allows the offending conduct to occur repeatedly without shuttering or even temporarily suspending suppliers' stores that have products that infringe on valid copyrights.

29. Simply put, there is nothing stopping Alibaba from (i) easily monitoring and stopping copyright infringement and (ii) taking action against—and at the least, temporarily suspending—suppliers who infringe another's copyright, just after one violation. If Alibaba wanted to stop copyright infringement, it could easily do both. But Alibaba does not want to stop copyright infringement, so it does neither. Quite the opposite: it encourages suppliers to go ahead and infringe others' copyrights up to 48 penalty points before even facing the threat of termination—that is assuming that termination ever occurs. In actuality, Alibaba's platform is a dream for an infringing supplier, and of course, Alibaba directly benefits from this practice.

30. Alibaba chooses not to stop copyright infringement for the simple reason: Alibaba directly profits from it.

31. Alibaba generally earns a commission fee for every product sold through its e-commerce businesses, ranging from 2.5%-8%. Because of this structure, Alibaba has a financial incentive to allow copyright infringement on its platform.

32. The fact that Alibaba knows that copyright infringement—especially when it comes at the expense of independent, small artists and creators—is a lucrative enterprise that benefits Alibaba is exemplified through its lax enforcement regime and lack of sufficient, reasonable punitive action against Alibaba suppliers engaged in copyright infringement.

33. As alleged herein, Alibaba takes *no punitive action* for a supplier's first identified instance of copyright infringement, and outside of whatever Alibaba deems to be a "serious

violation," a supplier can accumulate 48 violation points for copyright infringement before Alibaba will shut down the supplier's account—if Alibaba ever does. As Alibaba explains to suppliers, they will receive six penalty points for each violation of Alibaba's copyright infringement policy after the first "free" violation. This means that an Alibaba supplier can be actively caught committing copyright infringement on ***eight*** separate occasions, and Alibaba will still not close the supplier's account.

34. Instead of having a zero-tolerance policy—or at least instituting some type of punitive measures for suppliers committing copyright infringement, such as a temporary suspension—Alibaba actively facilitates the continued copyright infringement of its suppliers, while representing to suppliers that it is their primary obligation (meaning it is also Alibaba's obligation) to list their products truthfully and in compliance with all applicable laws.

35. And Alibaba itself discloses to suppliers that it will perform "random" checks to ensure that suppliers are complying with Alibaba's intellectual property rules, so Alibaba has the ability to police copyright infringement on its platform, as it already does this "randomly." This demonstrated ability, coupled with the fact that suppliers are required to provide Alibaba detailed product-listing information, means that Alibaba already has within its possession a database of everything on its e-commerce platforms. If it so chooses, Alibaba could easily police copyright infringement of its suppliers, but it does not because the financial rewards of allowing it to continue are worth any negative consequences.

36. Alibaba has a long history of copyright infringement of U.S. copyright holders.

37. One need only perform a simple internet search to find voluminous complaints from independent artists whose works have been stolen by Alibaba for its own gain and by Alibaba suppliers for their own gain—and again, Alibaba's gain through commissions—without the artists' permission or any type of license or compensation paid to the artists to use their works to produce or sell goods, services, or tools.

38. Official reports and media about the rampant, systematic infringement on Alibaba are legion:

a. The United States Trade Representative's office included AliExpress in its Review of Notorious Markets and Counterfeiting and Piracy Report;

b. The Chinese State Administration for Industry and Commerce released a report summarizing issues on Alibaba's e-commerce websites and apps.

c. The Information Technology & Innovation Foundation released a report entitled "How Chinese Online Marketplaces Fuel Counterfeits," detailing the continued infringement of U.S. copyright holders on Chinese e-commerce websites and apps, including AliExpress; and

d. BuzzFeed News published an investigative-journalism report detailing the rampant copyright infringement occurring on Alibaba's e-commerce websites and apps, entitled "Small American Businesses Are Struggling Against a Flood of Chinese Fakes."[10]

39. Mr. Giana's experience is representative and similar to many other artists whose work has been misappropriated by Alibaba and Alibaba suppliers. Mr. Giana is an American artist who lives in Florida. For the past 40 years, Mr. Giana has earned a living by creating and licensing his artwork for use on book covers, magazines, board games, and CDs, among other mediums. As a professional artist, Mr. Giana registers his copyrights with the U.S. Copyright Office. Mr. Giana has never sold, licensed, or otherwise authorized the use of his artistic works to Alibaba, any Alibaba-related entity, or any Alibaba supplier. Despite this, Alibaba has and continues to sell products that copy, plagiarize, or counterfeit Mr. Giana's works directly into products selling on Alibaba's websites and apps, hampering Mr. Giana's own sales and enriching Alibaba.

40. In investigating the extent of the copyright infringement, Mr. Giana was able to readily identify numerous direct copies, pirating, plagiarism, and counterfeits of his copyright-registered works, without any assignment, permission, or other type of conveyance from him or his licensees. The number of infringements of copyright-registered works is staggering and legion: as of the date of the filing of this Class Action Complaint, Mr. Giana has identified over 80

[10] Cites to these reports and details about them are alleged *infra*.

infringements.

41. As alleged herein with comparison images (and exhibited to this Class Action Complaint because the volume of infringements is massive), the resemblance of the infringed images to Mr. Giana's copyright-registered images are uncanny. They are the same images; they are direct copies, pirating, plagiarism, and counterfeit; there is no argument of fair use.

42. In summary, through a pervasive infringement and misappropriation scheme of Alibaba and Alibaba suppliers, including, without limitation, the reproduction, copying, distribution, display, or sale of products with the infringed or misappropriated images or designs, Alibaba has infringed—and continues to infringe—on the copyrights owned by Mr. Giana and tens or hundreds of thousands (if not more) of Class members across the United States. Accordingly, Alibaba has profited substantially from the sale of such infringing goods through direct infringement and/or willfully turning a blind eye to—and even condoning and facilitating—the rampant copyright infringement occurring on Alibaba's e-commerce websites and apps.

43. Because neither Mr. Giana nor Class members have authorized, licensed, transferred, or in any way permitted Alibaba or Alibaba suppliers to use or exploit their copyrighted works, this action seeks to hold Alibaba accountable for the widespread financial harm that its unlawful systematic infringement has caused and to enjoin further harm.

**JURISDICTION AND VENUE**

44. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Copyright Act, 17 U.S.C. §§ 501, *et seq.,* and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, commonly referred to as "RICO."

45. This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act and 28 U.S.C. § 1332(d) because there exists minimal diversity between Class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

46. The Court also has subject matter jurisdiction under 28 U.S.C. § 1338 because this case involves a claim for copyright infringement.

47. Jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), 1391(b)(3), 1391(c)(2), and 18 U.S.C. § 1965. Defendants have infringed Mr. Giana and Class members' rights in this District and across the United States, causing economic, reputational, and other harm to Mr. Giana and Class members in this District and across the United States. Alibaba conducts, transacts, or solicits business in New York.

48. Personal jurisdiction exists over Alibaba in New York, pursuant to N.Y.C.P.L.R. §§ 302(a)(1), 302(a)(3), or in the alternative, Federal Rule of Civil Procedure ("F.R.C.P.") 4(k), since upon information and belief, Alibaba regularly conducts, transacts, or solicits business in New York, derives substantial revenue from Defendants' business transactions in New York, or otherwise avails themselves of the privileges and protections of the laws of the State of New York, such that this Court's assertion of jurisdiction over Defendants does not offend traditional notions of fair play and due process.

49. Alibaba publicly discloses that it has a U.S. office in New York, New York. It has been reported that Alibaba has rented more than 30,000 square feet of office space at 860 Washington Street, New York, NY 10014.

50. Around May 6, 2014, Alibaba Group, the parent holding company of the Defendants, filed its Form F-1 with the U.S. Securities and Exchange Commission ("SEC") for an initial public offering of its American Depository Shares ("ADSs") in the United States to be listed on the New York Stock Exchange. Alibaba's ADSs have been listed on the New York Stock Exchange since 2014, under the symbol "BABA[.]" The depositary for Alibaba's ADSs is Citibank, N.A., whose office is located at 388 Greenwich Street, New York, New York 10013. In Alibaba Group's Form 424(b)(3) Prospectus filed with the SEC around September 4, 2025, Alibaba disclosed that its agent for service of process in the United States is the Corporation Service Company located at 19 West 44th Street, Suite 200, New York, NY 10036.

51. Joseph Chung-Hsin Tsai ("Mr. Tsai"), who is Alibaba's Co-Founder and has been its Chairman, is no stranger to New York. Mr. Tsai reportedly owns at least portions of the Brooklyn Nets of the National Basketball Association and New York Liberty of the Women's

National Basketball Association. It has been recently reported that Mr. Tsai has been working with the Brooklyn Nets and New York Liberty to further strengthen the teams' sponsorship deals with Alibaba, including, without limitation, through having Alipay+, the merchant gateway that allows businesses to accept Alipay, installed in arena payment consoles and arena concession stands for both teams.

52. Alibaba Group and its subsidiaries provide products, services, or tools itself or sold by global Alibaba suppliers to customers throughout the United States, including, without limitation, to customers in this District, and Alibaba has thereby profited from its infringing activity in this District. The products, services, or tools sold on Alibaba's platforms and the conduct of the Alibaba suppliers are directed at and intended for commercial use by persons in this District and throughout the United States.

53. Defendants have been and are systematically directing or targeting their business activities at consumers in the U.S., including in New York, through accounts on online marketplace platforms and apps, such as Alibaba and AliExpress, through which consumers in the U.S., including in New York, can view one or more of the storefronts that Defendants operate, can use to communicate with listings for infringing products, and to place orders, receive invoices, and purchase infringing products for delivery in the United States, including in New York, which are a means for Alibaba to establish regular business within the United States, including in New York.

54. Defendants are sophisticated sellers, each operating one or more commercial businesses to manufacture, import, export, advertise, market, promote, distribute, offer for sale, or otherwise deal in services or products, including, without limitation, the infringing products, at significantly below-market prices to consumers worldwide, including to those in the U.S., and specifically in New York.

55. Defendants regularly conduct, transact, or solicit business in the United States and New York specifically and derive substantial revenue from products or services used or consumed in the United States and New York specifically, in connection with the unlawful conduct alleged herein, which has caused and continues to cause injury to Mr. Giana and Class members in the

U.S. and in New York.

56. Defendants target customers in the United States, including customers located in New York, through online marketing and advertising.

57. Defendants accept payment in U.S. Dollars and offer shipping to the United States, including in New York.

58. Defendants have transacted business with consumers located in the U.S., including in New York, for the sale and shipment of the infringing products.

59. Alibaba operates the Alibaba platforms and apps, such as Alibaba and AliExpress, which facilitate the offering for sale and sale of the infringing products, with the knowledge and intent that such infringing products (i) will ultimately be sold to consumers throughout the U.S., including in New York, (ii) cause substantial consumer confusion among consumers throughout the U.S., including in New York, and (iii) cause harm throughout the United States, including in New York.

60. To the extent that any Defendant is found not to have sufficient minimal contacts with this District under standard personal jurisdiction principles, this Court may still exercise personal jurisdiction over such Defendant, pursuant to 18 U.S.C. § 1965(b), because the ends of justice require that the Court exercise personal jurisdiction over any defendant who claims not to have sufficient minimum contacts with the forum. Defendants have engaged in a multi-district conspiracy to defraud and otherwise harm Mr. Giana and Class members.

## PARTIES

61. Plaintiff Alan Giana is over the age of 18 and is a citizen of Florida. Mr. Giana is a renowned digital artist and painter who earns a living by creating, licensing, and selling artistic works, including, without limitation, in this District, whose registered works were infringed by Alibaba and its suppliers.

62. Alibaba operates through a number of corporate entities each serving distinct and particularized services targeted at a different part of the platform's ecosystem or geographic area. Alibaba started its online retail platform in 1999, but as early as 2009, Alibaba established a Cloud

Computing division to handle the platform's increased data-management needs. Defendants are also in the practice of acquiring companies that develop novel digital technologies, which are then integrated into Alibaba's ecosystem to optimize their data-processing operations and retail offerings.

63. The Alibaba Defendants operate through a complex and opaque corporate structure designed to obfuscate responsibility for intellectual property theft and avoid liability. Defendants use the name "Alibaba" to refer to a conglomeration of companies spread throughout the world.

64. Mr. Giana alleges the following in connection with Alibaba:

a. Defendant Alibaba Group Holding, Ltd. (also referred to herein as "Alibaba Group") is a business entity formed under the laws of the Cayman Islands. Alibaba Group aggregates Alibaba's various corporate subsidiaries and allows the parent company to exercise effective control over and coordinate the operations of the subsidiaries. The companies held by Alibaba Group include, without limitation, Alibaba.com Hong Kong, Ltd., Defendant Alibaba.com Singapore E-Commerce One Pte. Ltd., and Alibaba Cloud (Singapore) Private, Ltd., and the e-commerce websites and apps held by Alibaba Defendants include Alibaba, AliExpress, Taobao China, Zhejiang Taobao, and others. Alibaba Group oversees Alibaba's e-commerce businesses, including, without limitation, AliExpress E-Commerce One Pte. Ltd.

b. Defendant Alipay Labs (Singapore) Pte. Ltd. ("Alipay Labs") is an entity organized under the laws of Singapore. Alipay Labs performs payment-processing operations across Alibaba's e-commerce websites and apps.

c. Defendant AliExpress E-Commerce One Pte. Ltd. ("AliExpress E-Commerce") is a business entity organized under the laws of Singapore. Defendant AliExpress E-Commerce is responsible for operation of the website aliexpress.com in the United States, as well as its associated

trademarks. Among other things, AliExpress E-Commerce has responsibility for facilitating the sale of new products in the United States, including, without limitation, by identifying supposed consumer trends and designing products sold in the United States.

d. Defendant Alibaba.com Singapore E-Commerce One Pte. Ltd. ("Alibaba Singapore") is a business entity organized under the laws of Singapore. Defendant Alibaba Singapore is responsible for operation of the website Alibaba.com in the United States, as well as its associated trademarks. Among other things, Alibaba Singapore has responsibility for facilitating the sale of new products in the United States, including, without limitation, by identifying supposed consumer trends and designing products sold in the United States.

65. Alibaba's complex corporate structure prevents victims from identifying the specific entity or entities responsible for infringing their copyrights, whether that is directly or through failure to manage or police the e-commerce websites or apps that Alibaba has developed. Furthermore and in addition, Alibaba provides a layer of insulation for the Alibaba suppliers, who are also committing direct infringement, while Alibaba simultaneously profits off of the suppliers' alleged unlawful activity of selling infringing products.

66. On information and belief, Does 1-10 are individuals or entities who facilitate Alibaba's alleged unlawful practices described in this Class Action Complaint. The identities of Does 1-10 are not presently known to Mr. Giana but will be added to the action by name, if and when their identities and actions are discovered.

## ALIBABA'S COPYRIGHT INFRINGEMENT SCHEME

### I. Alibaba's History, Business Model, and Relationship to its Suppliers

67. Alibaba's founders launched Alibaba.com in 1999 as a global e-commerce business. Since then, Alibaba continues to grow its e-commerce offerings, platforms, websites, and apps, including, without limitation, launching (then-entitled) Taobao in 2003, Taobao Mall

("Tmall") in 2008, Alibaba Cloud in 2009, AliExpress in 2010, Tmall Taobao World in 2017, and Qwen in 2023, which is Alibaba's propriety AI large-language model.[11]

68. Throughout the years, Alibaba's revenue has continued to climb, especially following the COVID-19 pandemic. Alibaba's annual revenue was approximately $52 billion in 2019, and it rose to approximately $71 billion in 2020, as the global pandemic set in. Its annual revenue soared to more than approximately $136 billion in 2025.

69. Alibaba's e-commerce portfolio is organized into two different groups, the Alibaba China E-commerce Group and the Alibaba International Digital Commerce Group.[12] The Alibaba International Digital Commerce Group is comprised of e-commerce platforms of AliExpress, Trendyol, Lazada, Daraz, and Alibaba.com.

70. Alibaba's retail e-commerce websites and apps operate as marketplaces where consumers can connect directly with Alibaba itself and/or with Alibaba suppliers through each platform. For example, AliExpress is "a leading global retail e-commerce platform enabling consumers to buy directly from manufacturers around the world."[13]

71. Alibaba's e-commerce websites and apps can operate as marketplaces, connecting Alibaba itself or Alibaba suppliers directly to consumers across the world, all while Alibaba works in the background to manage, control, and direct the activity on its e-commerce websites and apps.

72. Individuals and businesses wishing to sell on one of Alibaba's e-commerce websites or apps must successfully complete a registration process with Alibaba.

73. Alibaba's registration process for suppliers on its websites or apps generally follows the process alleged here for AliExpress (the processes for Alibaba's other websites or apps are generally similar).

74. First, prospective suppliers are required to provide Alibaba with their country of

---

[11] Alibaba Milestones, https://www.alibabagroup.com/en-US/about-alibaba (last visited June 2, 2026).

[12] *Our Business*, Alibabagroup.com, https://www.alibabagroup.com/en-US/about-alibaba-businesses (last visited June 2, 2026).

[13] *See* AliExpress Information Page, https://www.alibabagroup.com/en-US/about-alibaba-businesses-1747705938191581184 (last visited June 2, 2026).

residence and email, and they must affirm that the merchant has read and agreed to Alibaba's Service Agreement, Transaction Services Agreement, Free Membership Agreement, Terms of Use, Product Listing Policy, and Privacy Policy.

75. AliExpress offers prospective suppliers two different store options when opening a store on AliExpress: the AliExpress Direct Store and/or the AliExpress Marketplace Store. AliExpress explains that under the Marketplace Store model "Aliexpress merchants operate their own accounts, with zero annual fees and low referral fees" and that the accounts receive "operational support."[14] Under the Direct Store model, the Alibaba supplier "is responsible for local supply and logistics delivery, and the platform is responsible for store operation."[15]

76. In selecting and opening a store on Alibaba, suppliers agree to the AliExpress Basic Rules for Sellers ("AliExpress Rules").[16] The AliExpress Rules govern the relationship between Alibaba and the supplier, in addition to other rules specific to topics, such as product management, transaction management, and logistics management.

77. The AliExpress Rules govern the relationship between the supplier and Alibaba, with rules to the effect of the following language from AliExpress:

- "Sellers using email addresses on AliExpress must not contain any information that violates any applicable laws and regulations or is suspected of infringing upon the rights of others or disrupting the operation of AliExpress."
- "AliExpress will review the Sellers' qualifications upon onboarding. If any fabricated, invalid, or expired credentials are detected, Sellers must immediately update their information with valid and authentic documentation. Failure to provide such documentation may lead to penalties imposed by AliExpress on the seller's store, which may include, without limitation, freezing, restricting, or shutting down the store."

---

[14] AliExpress Sellers Page, https://sell.aliexpress.com/us/ (last visited Nov. 24, 2025).
[15] *Id.*
[16] AliExpress Basic Rules for Sellers, https://rule.aliexpress.com/rule-channels/49971998/175568188 (last visited June 2, 2026).

- "After authentication has been completed, Sellers can only publish products after completing the category-solicitation-admission process, according to the system's procedures."
- "It is the primary obligation of sellers to describe products truthfully and take responsibility for the quality of the products that they sell. 'Truthfully describing products' means that sellers should provide accurate and complete descriptions of the basic attributes, conditions, flaws, and other necessary information of the products on the product description page, store page, and all other channels provided by AliExpress."
- "If there are any serious offenses, such as selling fake goods, speculation, fraud, etc., the seller's account can be closed by AliExpress, or the seller may be removed from the operating category or be restricted to operate in AliExpress."
- "In the case of serious infringement of AliExpress's platform-related agreements or rules, leading to serious damage to the interests of consumers and/or affecting the operating platform, the platform has the right to immediately suspend the account or shut down the seller operating authority."[17]

78. When suppliers are setting-up their store, they are required to provide Alibaba with detailed information concerning the proposed product listings, including the following, without limitation: (i) the language in which they will publish the product; (ii) the origin and country of shipment of the product; (iii) the category and subcategory of the product; (iv) the minimum sales unit; (v) the product name, including brand, model, and relevant keywords; (vi) a detailed description of the product, including, without limitation, features, functions, and conversion-oriented benefits; (vii) final price and the stock available; (viii) images of the product; (ix) estimated delivery time; and (x) logistics data.[18]

---

[17] *Id.*
[18] Encarni Arcoya, *Complete guide to selling on AliExpress: requirements, advantages, and keys to success*, ActualidateCommerce, https://en.actualidadecommerce.com/sell-on-AliExpress/ (last visited June 2, 2026).

79. Once Alibaba approves a supplier, the supplier can open up their store in Alibaba's e-commerce websites and apps and begin operations through Alibaba's sales process.

**II. Reporting of Alibaba's Regular Practice of Copyright Infringement**

80. Alibaba has a long history of copyright infringement of U.S. copyright holders.

81. In 2015, the Chinese State Administration for Industry and Commerce released a report summarizing issues on Alibaba's e-commerce websites and apps, including, without limitation, Taobao Marketplace and Tmall.com.[19] The report found 19 problems in five main areas on Alibaba's sites, including, without limitation, "a number of unlicensed or unregistered vendors selling items, including knockoffs and goods that were improperly imported or banned from sales in China."[20]

82. In 2017, BuzzFeed News published an investigative-journalism report detailing the rampant copyright infringement occurring on Alibaba's e-commerce websites and apps, entitled "Small American Businesses Are Struggling Against a Flood of Chinese Fakes."[21]

83. The report details the struggles of small, independent U.S. businesses, such as Little Faces Apparel, whose products and images were directly copied by Alibaba suppliers on AliExpress. When Little Faces Apparel's owner contacted AliExpress to try getting the offending listings taken down, "her request to take down the product was ignored even after she sent evidence from her social media profile that the photograph advertising the product was her. Almost a year after first reporting the issue Tong Lok Children's Clothing [the offending AliExpress merchant] is still selling her designs."[22]

84. In 2022, the U.S. Trade Representative's office included AliExpress in its Review

---

[19] Neil Gough and Paul Mozur, *Chinese Government Takes Aim at E-Commerce Giant Alibaba Over Fake Goods*, Jan. 28, 2015, https://archive.nytimes.com/bits.blogs.nytimes.com/2015/01/28/chinese-government-takes-aim-at-e-commerce-giant-alibaba/?ref=business (last visited June 2, 2026).

[20] *Id*.

[21] Leticia Miranda and Megha Rajagopalan, *Small American Businesses Are Struggling Against a Flood of Chinese Fakes*, BuzzFeed News, Apr. 4, 2017, https://www.buzzfeednews.com/article/leticiamiranda/small-businesses-struggle-flood-of-chinese-fakes (last visited June 2, 2026).

[22] *Id*.

of Notorious Markets and Counterfeiting and Piracy Report.[23] The review notes "right holders report the continued lack of effective seller vetting and repeat infringer controls, such that AliExpress is a dominant upstream distributor of counterfeit goods in wholesale quantities for online markets in the United States and other countries." It gets worse: "right holders express concerns that counterfeit sellers have been able to obtain accounts fraudulently by using an unrelated business license" and "penalties for repeat infringers do not stop known counterfeit sellers on AliExpress from remaining on the market, such as by operating multiple accounts."[24]

85. And as recently as this year, the Information Technology & Innovation Foundation ("ITIF"), released a report entitled "How Chinese Online Marketplaces Fuel Counterfeits," detailing the continued infringement of U.S. copyright holders on Chinese e-commerce websites and apps, including AliExpress.[25]

86. The report details the structural reasons why websites and apps, such as AliExpress, continue to allow and are incentivized by copyright infringement: "[T]o maintain the significant benefits they receive from the Chinese government's e-commerce industrial policy, … AliExpress, SHEIN, and other Chinese e-commerce platforms need to continue growing market share globally, which at the moment means competing on value. Therefore, lax enforcement of counterfeit goods is not simply a business failure but also a byproduct of the system in which these platforms operate."[26]

87. In creating its report, ITIF engaged in mystery shopping on AliExpress to determine the extent and scope of infringing product listings. ITIF's experience purchasing knockoff Nike brand shoes is instructive.[27]

---

[23] Office of the United States Trade Representative, 2022 Review of Notorious Markets for Counterfeiting and Piracy, https://ustr.gov/sites/default/files/2023-01/2022%20Notorious%20Markets%20List%20(final).pdf (last visited June 2, 2026).
[24] *Id.*
[25] Eli Clemens, How Chinese Online Marketplaces Fuel Counterfeits, Information Technology & Innovation Foundation, https://itif.org/publications/2025/08/20/how-chinese-online-marketplaces-fuel-counterfeits/ (last visited June 2, 2026).
[26] *Id.*
[27] *Id.*

88. ITIF purchased a pair of Nike "Air Max 270" shoes from AliExpress, based on a suspicious listing, in which the listed price at $44.72 was far below Nike's typical Air Max 270 MSRP of between $130 and $160.[28]

89. Importantly, on the listing that ITIF purchased from, AliExpress designated the vendor, OutdoorBrands Shoes, as a "certified brand" that "promises to have obtained brand authorization and signed a genuine product commitment letter. These are official branded items that were sold through the AliExpress platform and purchased through legitimate channels."[29]




90. To determine the authenticity of the shoes that ITIF received, it utilized Poizon, a Chinese authentication app that "uses advanced AI technology, backed by extensive datasets[,]" to authenticate brand authenticity to 90 percent accuracy through user-uploaded photos.[30] As detailed in the report, the shoes did not pass authentication, and Poizon flagged authentication risks due to the shoe's appearance.[31]

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*




91. The report goes on to detail other instances of products that infringe on U.S. copyright holders, including, without limitation, Honda, Toyota, Disney, and Ralph Lauren.[32]

92. In short, Alibaba is well aware of the pervasive copyright infringement occurring on its e-commerce websites and apps, and although it can easily moderate its e-commerce websites and apps to cease the blatant copyright infringement that occurs, Alibaba's own content-moderation procedures actually only go to further allow and facilitate copyright infringement, not stop it.

## III. Alibaba's Direct Copyright Infringement Practices

93. While Alibaba wants to enshroud itself in a marketplace mystique, when one pulls back the curtain, Alibaba's own infringing practices become apparent.

94. Alibaba itself directly infringes copyrights. It markets, offers, and sells products that infringe Class members' copyrights.

95. Through the reproduction, copying, distribution, display, or sale of products with the infringed or misappropriated images or designs, Alibaba has infringed—and continues to infringe—the copyrights owned by tens of thousands (if not more) of persons or entities similarly situated across the United States. Accordingly, Alibaba has profited substantially from the sale of

---

[32] *Id.*

such infringing goods by selling them itself.

96. Because Class members have not authorized, licensed, transferred, or in any way permitted Alibaba to use or exploit their copyrighted works, this action seeks to hold Alibaba accountable for the widespread financial harm that its unlawful infringement has caused and to enjoin Alibaba from allowing the sale of copyright-infringing works on its platform that rightly belong to Class members.

97. It does not stop with Alibaba's direct sales of products that infringe Class members' copyrights.

98. Alibaba also runs various e-commerce websites and apps where Alibaba suppliers ostensibly sell products to consumers across the world, especially within the United States. When suppliers complete Alibaba's registration process, they are required to upload to Alibaba the photos of products that they are selling.

99. When suppliers upload these photos, they are stored on Alibaba's servers or on a server that Alibaba maintains for such a purpose. The photos are thus copied onto Alibaba's servers or on a server that Alibaba maintains for such a purpose.

100. When a user is perusing Alibaba, including in the United States, Alibaba generates the thumbnail and other images that a user sees when looking at the products available from Alibaba. To generate those images, Alibaba displays the images copied onto its servers, including, without limitation, those that contain infringing works. The copyright holders' interests in these works are infringed when copied onto Alibaba's servers or on a server that Alibaba maintains for such a purpose. Further, Alibaba then displays those unlawfully copied and infringed copyrighted works on its e-commerce websites or apps, including in the United States, thus displaying copyrighted works impermissibly without the authorization, license, or payment to the copyright holders.

101. Alibaba's infringing activities do not stop there: Alibaba's sales practices also infringe on the copyrights of individuals whose copyrighted work is copied into products that are sold through Alibaba.

102. Within Alibaba's suite of companies is an entity called Alipay, which is a payment processor. Alipay is the payment processor for the vast majority of transactions occurring on Alibaba's e-commerce websites and apps. Without the integration of Alipay, Alibaba would not be able to process the sales transactions occurring on its platform. The use of Alipay is not free, and as alleged herein, not only does Alibaba assess product-related fees, but Alibaba also imposes transaction fees on suppliers for use of Alipays' payment-processing services. Infringing products sold through Alibaba's e-commerce websites and Apps that use Alipay lines the pockets of Alibaba and enables the transactions.

103. Harkening back to a brick-and-mortar department store comparison, Alibaba may claim that its suppliers are offering the products for sale, but just like a brick-and-mortar department store, users come into an Alibaba-branded store front, see recommendations from Alibaba concerning the suppliers from whom they should buy products, and make purchases through Alibaba, not the suppliers. Just like a consumer buying a pair of Nike shoes at Target, the Alibaba experience is no different, and Alibaba's willful copying, display, and sale of copyrighted works directly infringes on the copyrighted works of Mr. Giana (more than 80 of them identified as of the date of the filing of this class action) and Class members.

104. Further supporting this example of how Alibaba is involved in the direct selling that infringes Class members' copyrights, Alibaba actively sanctions Alibaba suppliers' sales of infringing products. Alibaba's Choice commitment (as articulated by Alibaba with different verbiage from time-to-time and with capitalization or without) is a designation meant to highlight products, listings, or suppliers that meet Alibaba's purportedly elevated performance, reliability, and quality criteria, through which Alibaba signals to consumers that the products, listings, or suppliers are easier and potentially safer picks for consumers, compared with generic, untagged listings. Products, listings, or suppliers labeled with Alibaba Choice are selected by Alibaba because according to Alibaba, those products, listings, or suppliers perform better on Alibaba's key measures. Products that infringe Class members' copyrights but yet are selected by Alibaba with its Choice label reflect Alibaba's direct involvement in the infringing posting or sale,

especially where Alibaba directly earns money from these sales through at the least, the commission fees alleged herein—or in addition to direct infringement or in the alternative, this reflects Alibaba's contributory and/or vicarious infringement.

105. Another example is Alibaba's Service commitment (as articulated by Alibaba with different verbiage from time-to-time and with capitalization or without), which is a designation meant to promise or guarantee how a transaction will be handled, often by Alibaba itself. Products, listings, or suppliers labeled with Alibaba's Service commitment are designated by Alibaba to give consumers assurances about product performance, quality, and delivery. Products that infringe Class members' copyrights but yet are selected by Alibaba with its Service commitment reflect Alibaba's direct involvement in the infringing posting or sale, especially where Alibaba directly earns money from these sales through at the least, the commission fees alleged herein—or in addition to direct infringement or in the alternative, this reflects Alibaba's contributory and/or vicarious infringement.

106. Another example is Alibaba's Verified commitment (as articulated by Alibaba with different verbiage from time-to-time and with capitalization or without), which is Alibaba's trust badge that indicates that a product, listing, or supplier has passed Alibaba's specific legitimacy, authenticity, identity, and quality checks. Products, listings, or suppliers labeled with Alibaba's Verified badge are designated by Alibaba to give consumers assurances about product and supplier legitimacy. Alibaba goes far enough to assure consumers that for its Verified suppliers, the suppliers have undergone a strict inspection process, including, without limitation, vetting suppliers' intellectual-property rights over products, services, or tools offered. Products that infringe Class members' copyrights but yet are selected by Alibaba with its Verified badge reflect Alibaba's direct involvement in the infringing posting or sale, especially where Alibaba directly earns money from these sales through at the least, the commission fees alleged herein—or in addition to direct infringement or in the alternative, this reflects Alibaba's contributory and/or vicarious infringement.

## IV. Alibaba's Contributory Copyright Infringement Practices

107. Despite knowing that copyright infringement is rampant on its e-commerce platforms, Alibaba maintains lax oversight features and penalties for copyright infringement.

108. Alibaba puts the onus on copyright holders—despite that Alibaba has the ability, tools, and processes to easily police and eliminate copyright infringement—to submit copyright-infringement claims to Alibaba through a platform called the Alibaba International IP Protection Platform ("IPP"). According to the IPP's website, copyright holders can purportedly protect their intellectual property by registering for an account, providing proof of their copyright, and informing Alibaba of offending listings.[33]

109. Once complaints are submitted, Alibaba will purportedly investigate, and if there are violations, Alibaba will purportedly institute an enforcement action against the merchant.

110. Suppliers have access to the "Update of Enforcement Actions for Intellectual Property Rights (IPR)" through the AliExpress website.[34]

111. As AliExpress conveys to its suppliers, "[i]f a seller posts or sells products that infringe on another party's intellectual property right, it may be complained by intellectual property rights owners or buys. The platform will also *initiate random check on the information of products* (including Off-Shelf products) and product listings."[35]

112. But AliExpress' empty assurances could not be further from the truth.

113. A review of AliExpress' copyright-infringement-points policy shows that Alibaba condones and facilitates copyright infringement.

114. Generally, AliExpress' copyright-infringement-points policy is described here:

---

[33] IPP Platform Instructions, https://ipp.aidcgroup.net/index.htm?language=en_US#/instruction/part2 (last visited June 2, 2026).

[34] Update of Enforcement Actions for Intellectual Property Rights ("IPR"), https://rule.aliexpress.com/rule-channels/49971998/173237285 (last visited June 2, 2026). The enforcement rules and company monitoring are substantially similar for Alibaba.com and are available here: https://rulechannel.alibaba.com/icbu?type=detail&ruleId=11000393&cId=1395#/rule/detail?cId=1395&ruleId=11000393.

[35] *Id*. (emphasis added).

| | | |
|---|---|---|
| Copyrights Infringement | Any unauthorized use of copyrighted materials, such as text, images, viodes, music, software, will amount to copyright infringement.<br>**Physical product violation:**<br>1) the product or its packaging is pirated;<br>2) the physical product or its packaging is not a pirate, but includes unauthorized copyrighted works;<br>**Information violation:**<br>The product or its packaging not infringing, but there's unauthorized use of copyrighted works, such as pictures or texts etc. on the product listing(s) | 1) No penalty point incurred for the first violation;<br>2) 6 penalty points incurred for each repeat violation;<br>3) 48 penalty points cumulatively incurred results in membership termination. |

115. Further down on that same webpage, AliExpress provides suppliers with an "Annex," which includes additional information regarding copyright-infringement review and penalties on AliExpress, to the effect of the following:

- Applicable enforcement actions will be imposed based on the complaint and the product listing status, as of when the intellectual property rights holder's complaint was received or when a random check was conducted.
- AliExpress has the right to impose penalties against violations and infringements conducted by Alibaba suppliers and take actions against them, including the following, without limitation: (1) rejection, removal, or within certain countries or regions, geo-blocking of product listings or information; (2) selling restrictions; (3) suspension of accounts; and (4) termination of accounts (including all associated accounts of the same entity).
- Under certain extreme or conspicuous situations, AliExpress reserves the right to terminate any AliExpress service agreements and free membership agreements, user accounts, and any and all accounts determined to be related to such users by AliExpress, at its sole discretion. AliExpress can implement other

> measures that AliExpress considers appropriate, at its discretion, for the purpose of protecting the legitimate rights or interests of consumers or intellectual property rights holders and maintaining normal operational order on AliExpress. "Extreme/conspicuous situations" include the following, without limitation: "(1) Where the repeat infringement acts committed are considered as serious; (2) Where litigation has already been initiated or legal demands have been requested by intellectual property rights holders against/to AliExpress; (3) [where Alibaba suppliers are] being sued by intellectual property rights holder[s], or being investigated by judiciary, enforcement or administrative authorities with respect to suspected infringements; (4) [where there are] [r]equests from judiciary, enforcement, or administrative authorities to terminate any account or take any relevant measures; or (5) Other circumstances that constitute serious violation[s]."

116. While Alibaba may claim that it has implemented a robust copyright-holder notice program that contains stiff penalties for noncompliance, the devil is in the details of how Alibaba's enforcement and penalty program works—and more accurately, how it is expressly designed to allow (and even encourage) continued infringement and in practice works to condone and facilitate copyright infringement.

117. Instead of effectively combating copyright infringement, Alibaba's enforcement and penalty program actively fosters its prevalence on Alibaba's e-commerce websites and apps.

118. It is Alibaba's policy that for the first instance of copyright infringement, "[n]o penalty point [is] incurred for the first violation."[36]

119. Second, for each successive violation, suppliers can potentially earn penalty points, including "6 penalty points incurred for each repeat violation."[37]

120. Third, it is not until a merchant incurs 48 penalty points that Alibaba will terminate

---

[36] *Id.*
[37] *Id.*

the suppliers' account. While Alibaba imposes other penalties for penalty-point accrual, it is only after 48 penalty points that a merchant's account will be terminated.

121. Fourth, Alibaba informs suppliers that "[a]ll of general violations and copyright infringements including rights holders' complaints (which include circumstances where a complaint is filed but no counter-notice is submitted by the seller within the specified time limit, or where the counter-notice submitted by the user is rejected) and random checks by AliExpress within three days shall be counted as one serious violation only."[38]

122. Fifth, Alibaba only records violations for 365 days from the date of the penalty imposed and has no such tracking mechanism for account termination within its "Update of Enforcement Actions for Intellectual Property Rights."[39]

123. While Alibaba may take other actions for "serious violations[,]" what constitutes a "serious violation" appears to be largely undefined and within the discretion of Alibaba.

124. Alibaba's copyright infringement policies and procedures can be summarized as follows: (1) Alibaba supposedly performs "random" checks of its e-commerce suppliers to determine whether there is any offending conduct; (2) Alibaba offers copyright holders a complaint portal to submit disputes regarding products that violate their copyrights; and (3) Alibaba takes action against suppliers for copyright infringement, but Alibaba only takes action after repeated instances—at least eight separate times—of copyright infringement and allows the offending conduct to occur repeatedly without shuttering or even temporarily suspending suppliers' stores that have products that infringe on valid copyrights.

125. Simply put, there is nothing stopping Alibaba from (i) easily monitoring and stopping copyright infringement and (ii) taking action against—and at the least, temporarily suspending—suppliers who infringe another's copyright, just after one violation. If Alibaba wanted to stop copyright infringement, it could easily do both. But Alibaba does not want to stop copyright infringement, so it does neither. Quite the opposite: it encourages suppliers to go ahead

---

[38] *Id.*
[39] *Id.*

and infringe others' copyrights up to 48 penalty points before even facing the threat of termination—that is assuming that termination even occurs. In actuality, Alibaba's platform is a dream for an infringing supplier, and of course, Alibaba directly benefits from this practice.

**V. Alibaba's Vicarious Copyright Infringing Practices**

126. In addition to Alibaba's own alleged direct infringing of copyrights, Alibaba is well aware of the rampant copyright infringement on its e-commerce websites and apps, and yet Alibaba continues to allow it to occur and/or fails to take any action to remove the infringing materials or punish the infringers, despite having the tools, ability, and infrastructure to easily stop it from happening.

127. Alibaba chooses not to stop copyright infringement for the simple reason that it directly profits from it.

128. Alibaba generally earns a commission fee for every product sold through its e-commerce businesses, ranging from 2.5%-8%. Because of this structure, Alibaba has a financial incentive to allow copyright infringement on its platform.

129. The fact that Alibaba knows that copyright infringement—especially when it comes at the expense of independent, small artists and creators—is a lucrative enterprise that benefits Alibaba is exemplified through its lax enforcement regime and lack of sufficient, reasonable punitive action against Alibaba suppliers engaged in copyright infringement.

130. As alleged herein, Alibaba takes ***no punitive action*** for a suppliers' first identified instance of copyright infringement, and outside of whatever Alibaba deems to be a "serious violation," suppliers can accumulate 48 violation points for copyright infringement before Alibaba will shut down the suppliers' account—if Alibaba ever does. As Alibaba explains to suppliers, they will receive six penalty points for each violation of Alibaba's copyright infringement policy after the first "free" violation. This means that an Alibaba supplier can be actively caught committing copyright infringement on ***eight*** separate occasions, and Alibaba will still not close the supplier's account.

131. Instead of having a zero-tolerance policy—or at least instituting some type of

punitive measures for suppliers committing copyright infringement, such as a temporary suspension—Alibaba actively facilitates the continued copyright infringement of its suppliers, while representing to suppliers that it is their primary obligation (meaning it is also Alibaba's obligation) to list their products truthfully and in compliance with all applicable laws.

132. And Alibaba itself discloses to suppliers that it will perform "random" checks to ensure that suppliers are complying with Alibaba's intellectual property rules, so Alibaba has the ability to police copyright infringement on its platform, as it already does this "randomly." This demonstrated ability, coupled with the fact that suppliers are required to provide Alibaba detailed product-listing information, means that Alibaba already has within its possession a database of everything on its e-commerce platforms. If it so chooses, Alibaba could easily police copyright infringement of its suppliers, but it does not because the financial rewards of allowing it to continue are worth any negative consequences.

133. In fact, if Alibaba so chooses, it could—for example—do a simple, quick Google image search at https://images.google.com/ to check whether Alibaba or Alibaba suppliers are infringing others' copyrights. For example, Alibaba could easily put into https://images.google.com/ the following image of the rhinestone embroidery décor that has been and is being offered, sold, and/or marketed by Alibaba, as alleged *infra*.



The results from the search on https://images.google.com/ clearly show Mr. Giana's work "Harvest Breeze IV":




Another example is that Alibaba could easily put into https://images.google.com/ the following image of the painting product kit that has been and is being offered, sold, and/or marketed by Alibaba, as alleged *infra*:



The results from the search on https://images.google.com/ clearly show Mr. Giana's work:




It took Mr. Giana approximately one minute to have checked the Google images searches on https://images.google.com/ in this alleged paragraph, which he conducted on February 10, 2026.

134. While Alibaba may claim that it has implemented a robust copyright-holder notice program that contains stiff penalties for noncompliance, the devil is in the details of how Alibaba's enforcement and penalty program works—and more accurately, how it is expressly designed to allow (and even encourage) continued infringement and in practice does not work.

135. Instead of effectively combating copyright infringement, Alibaba's enforcement and penalty program actively fosters its prevalence on Alibaba's e-commerce websites and apps.

136. Simply put, there is nothing stopping Alibaba from (i) easily monitoring and stopping copyright infringement and (ii) taking action against—and at the least, temporarily suspending—Alibaba suppliers who infringe another's copyright, just after one violation. If Alibaba wanted to stop copyright infringement, it could easily do both. But Alibaba does not want to stop copyright infringement, so it does neither. Quite the opposite: it encourages suppliers to go ahead and infringe others' copyrights up to 48 penalty points before even facing the threat of termination—if termination ever occurs.

137. Beyond that Alibaba fails to police Alibaba suppliers' copyright violations, Alibaba itself engages in similar infringing practices.

138. And beyond that Alibaba fails to police its suppliers' copyright violations and Alibaba itself engages in similar practices, Alibaba makes significant money from Alibaba suppliers' sales of products that infringe Mr. Giana's and the Class members' copyrights.

## PLAINTIFF'S FACTS

139. Mr. Giana is a renowned artist.

140. He creates colorful works in a style inspired by nature and the sea.

141. He has earned a living for the past 40 years creating, selling, and licensing art, including, without limitation, to commercial distributors (none of which licensed or authorized the use of his infringed works to Alibaba or Alibaba suppliers).

142. In school, Mr. Giana studied design and business management, with a bachelor's degree in graphic-design management.

143. During his long career, Mr. Giana has combined his artistic and business talents to

build a reputation and commercial enterprise centered on his artwork.

144. Mr. Giana has licensed his popular works to more than fifty companies in the United States and around the world for use in (among other products) puzzles, address labels, calendars, checks, cards, gift bags, gift boxes, tins, mugs, canvas prints, placemats, note cards, coasters, magnets, clocks, thermometers, music boxes, cross-stitch kits, and diamond painting kits. None of these companies have the right to license or otherwise have authorized Alibaba or Alibaba suppliers to use Mr. Giana's works, and to his knowledge, none of these companies have attempted to license his works to Alibaba or Alibaba suppliers.

145. Mr. Giana's original works have been displayed in galleries and art shows throughout the United States.

146. In recognition of the broad appeal and commercial value of Mr. Giana's works, he has won awards, including, without limitation, the Premier Print Award from the Printing Industry of America and the Oppenheim Toy Portfolio Best Toy Award.

147. Mr. Giana has never sold, licensed, and/or otherwise conveyed any right in any of his copyright-registered works alleged herein and exhibited to Alibaba or Alibaba suppliers.

148. Like other independent artists similarly situated, Mr. Giana's copyrighted art was not spared from Alibaba's modus operandi of copyright infringement.

149. Alibaba offered, marketed, copied, displayed, transmitted, sold, profited, and/or facilitated the sale of Mr. Giana's copyright-registered works, in addition to allowing Alibaba suppliers to have offered, marketed, copied, displayed, transmitted, sold, counterfeited, pirated, plagiarized, and/or profited from his copyright-registered works, without any authorization, permission, or license, and Alibaba earned profits from the sale of such infringing products.

150. In investigating the extent of the copyright infringement, Mr. Giana was able to readily identify numerous direct copies, pirating, plagiarism, and counterfeits of his copyright-registered works, without any assignment, permission, or other type of conveyance from him or his licensees. The number of infringements of copyright-registered works is staggering and legion: as of the date of the filing of this Class Action Complaint, Mr. Giana has identified over 80

infringements in the last several months alone.

151. For example, Mr. Giana created the original work "Harvest Breeze IV," which is registered with the United States Copyright Office under Reg. No. Vau# 1-293-807, with an effective date of registration of August 29, 2017. A reproduction of "Harvest Breeze IV" is immediately below.




152. While investigating the extent of Alibaba's copyright infringement, Mr. Giana discovered that "Harvest Breeze IV" was being sold on AliExpress. Alibaba is marketing, offering, selling, and/or transacting in Mr. Giana's painting as rhinestone embroidery décor in the United States, as shown in the image below.




153. The resemblance is uncanny; it is the same image; it is a direct copy, plagiarism, and counterfeit; this is not fair use.

154. Mr. Giana invested time, money, and effort into creating “Harvest Breeze IV,” and he never licensed, sold, or otherwise transferred any rights in the work for this use.

155. Regardless of Mr. Giana’s invested time, money, and effort, he is entitled to statutory damages for the infringement of this copyright-registered work.

156. Similarly, Mr. Giana created "Around the Lake II," which is registered with the U.S. Copyright office and bears Reg. No. 1-256-410, with an effective registration date of August 6, 2016. A reproduction of "Around the Lake II" is provided below.




157. While investigating the extent of Alibaba's infringement of his works, Mr. Giana discovered that "Around the Lake II" was being sold on AliExpress. "Around the Lake II" was incorporated into an embroidery product as shown below and sold on AliExpress. Alibaba is marketing, offering, selling, and/or transacting Mr. Giana's painting in the United States, as shown in the image below.




158. The resemblance is uncanny; these are the same images; they are direct copies, plagiarism, and counterfeit; this is not fair use.

159. Mr. Giana invested time, money, and effort into creating Around the Lake II, and he never licensed, sold, or otherwise transferred any rights in the works for this use.

160. Regardless of Mr. Giana's invested time, money, and effort, he is entitled to statutory damages for the infringement of this copyright-registered work.

161. Not only have Mr. Giana's works been reproduced and blatantly ripped off on AliExpress, but infringing activity is also occurring on Alibaba.com.

162. For example, Mr. Giana created the work "Gazebo by the Sea," which is registered with the U.S. Copyright Office with Reg. No. Vau# 1-181-563, with an effective registration date of July 23, 2014. A reproduction of "Gazebo by the Sea" is provided below.



163. While investigating Alibaba's copyright infringement, Mr. Giana discovered that his work "Gazebo by the Sea" was being sold through Alibaba.com as a painting product kit in the United States, as shown in the image below.



164. The resemblance is uncanny; it is the same image; it is a direct copy, plagiarism, and counterfeit; this is not fair use.

165. Mr. Giana invested time, money, and effort into creating “Gazebo by the Sea”, and he never licensed, sold, or otherwise transferred any rights in the work for this use.

166. Regardless of Mr. Giana’s invested time, money, and effort, he is entitled to statutory damages for the infringement of this copyright-registered work.

167. Similarly, Mr. Giana created the work “Endless Skies,” which is registered with the U.S. Copyright Office under the number Vau# 728-712, part of the collected works of Alan Giana from 2006, with an effective registration date of January 3, 2007. A reproduction of Endless Skies is provided below.




168. While investigating Alibaba’s copyright infringement, Mr. Giana discovered that his work Endless Skies was being sold on Alibaba.com as a 1000-piece jigsaw puzzle in the United States, which is shown in the image below. It is the product being sold as reflected in right tab of the image below and the third image from the left under the “Variations” and “Color” tab.




169. The resemblance is uncanny; it is the same image; it is a direct copy, plagiarism, and counterfeit; this is not fair use.

170. Mr. Giana invested time, money, and effort into creating Endless Skys, and he never licensed, sold, or otherwise transferred any rights in the work for this use.

171. Regardless of Mr. Giana's invested time, money, and effort, he is entitled to statutory damages for the infringement of this copyright-registered work.

172. The foregoing infringements are not isolated instances.

173. They are the tip of the iceberg.

174. In fact, approximately over 80 of Mr. Giana's copyright-registered works have been directly copied, pirated, plagiarized, or counterfeited on Alibaba. An Exhibit entitled "Alibaba Infringement Chart" that is filed concurrently and incorporated into this Class Action Complaint includes these works. None of these copyright-registered works were licensed for this use.

175. Alibaba trades on the commercial success and reputation of Mr. Giana and Class members for Alibaba's own profit by marketing, offering, copying, displaying, transmitting, and/or selling his and Class members' works, in addition to allowing his and Class members'

works to be copied, ripped-off, and repacked by Alibaba suppliers, to Mr. Giana's detriment and Alibaba's direct financial benefit.

176. Mr. Giana and Class members are victims of Defendants' unlawful scheme of mass-producing copyrighted works and then marketing, offering, copying, displaying, transmitting, and/or selling them on products.

**ALIBABA'S RICO COPYRIGHT CONSPIRACY**

## I. Alibaba's RICO Enterprise

177. Alibaba—including the Alibaba Defendants named herein and other non-defendant entities—operate as a broad conglomerate of entities to effectuate Alibaba's e-marketplaces and facilitate sales on those marketplaces, websites, and apps. Defendants and these entities were formed for a non-racketeering purpose and exist separate and apart from their pattern of racketeering activity to run the business of Alibaba's e-commerce platforms, which relevant to this litigation are Alibaba.com and AliExpress.com.

178. Separate and apart from their ordinary business activities, though there is overlap in the functions performed by the RICO persons between their normal business activity and activity in furtherance of the enterprise, the following RICO "persons" undertake a pattern of racketeering activity through a RICO "enterprise."

179. The RICO "person" is the Alibaba Group, and the "enterprise" consists of AliExpress E-Commerce and Alibaba Signapore. This enterprise is referred to throughout the remainder of this complaint as the "Alibaba RICO Enterprise." In addition to these entities, the other Defendants named within this Complaint contribute to the Alibaba RICO Enterprise. While not named defendants for purposes of the Alibaba RICO Enterprise, other Defendants named in this complaint play an integral role in the Alibaba RICO Enterprise's functions, such as Alipay Labs, which provides payment processing functions for the Alibaba RICO Enterprise.

180. The basic structure of the Alibaba RICO Enterprise is as follows:

a. Alibaba Group as the RICO person is the entity that owns Alibaba's various subsidiaries and manages their coordinated commercial efforts. For

example, Alibaba Group itself is organized internally in a way that facilitates their control and oversight over their corporate portfolio, including AliExpress E-Commerce and Alibaba Singapore. Specifically, within the Alibaba Group, there is a division called the Alibaba International Digital Commerce Group. As Alibaba Group's website shows, that division oversees both AliExpress E-Commerce and Alibaba Singapore, as AliExpress E-Commerce and Alibaba Singapore are the entities that run the day-to-day operations of AliExpress.com and Alibaba.com, respectively.[40]

b. AliExpress E-Commerce is one of the entities that forms the RICO enterprise. AliExpress E-Commerce is responsible for operations of the website AliExpress.com in the United States, including the products that are listed on AliExpress and the suppliers that operate on AliExpress, and AliExpress E-Commerce is responsible for managing all attenuated functions to effectuate sales on AliExpress.

c. Alibaba Singapore is one of the entities that forms the RICO enterprise. Alibaba Singapore is responsible for the operation of the website Alibaba.com in the United States, including the products that are listed on Alibaba and the suppliers that operate on Alibaba, and Alibaba Singapore is responsible for managing all attenuated functions to effectuate sales on AliExpress.

181. The Alibaba RICO Enterprise has operated since at least 2020, when Alibaba moved to centralize control of its e-commerce business in a top-down structure with Alibaba Group at the helm.[41] As such, the Alibaba RICO Enterprise has been in existence for a substantial

---

[40] *Our Business*, Alibabagroup.com, https://www.alibabagroup.com/en-US/about-alibaba-businesses (last visited June 2, 2026).

[41] Brands Factory, Alibaba Merges Domestic and Global E-Commerce in Major Shake-Up, substack.com, Nov. 21, 2024, https://chinesellers.substack.com/p/alibaba-merges-domestic-and-global.

period of time and continues to this day. The Alibaba RICO Enterprise's conduct is likely to continue—and in fact does continue—as Mr. Giana's work, as well as the work of thousands (if not more) of similarly situated individuals, is currently being infringed on either Alibaba.com or AliExpress.com.

182. Alibaba Group directed and conducted the affairs of the Alibaba RICO Enterprise because the Alibaba Group is the parent company of both entities and exerts strategic control and direction over each of them—including the directing and participating in the infringing activity at issue here. Alibaba Group has ultimate control over the conduct of the Alibaba RICO Enterprise, and as such, it could stop the infringing activity that occurs in the Alibaba RICO Enterprise—if it so chooses.

183. For example, in connection with the alleged 80-plus infringements of Mr. Giana's copyright-registered works, the following allegations explain how the Alibaba RICO Enterprise functions:

a. Alibaba Group effectively controls, coordinates, and directs the operations of its subsidiaries who effectuate the copyright infringement and wire fraud alleged in this Complaint. Alibaba Group oversees and has control over Alibaba's websites and apps, upon which the alleged infringements occur and the infringing products are transacted.

b. Alibaba Singapore is responsible for operation of the website Alibaba.com in the United States, and among other things, Alibaba Singapore has responsibility for facilitating the sale of the infringing products in the United States, including, without limitation, by effectuating sales of infringing products, storing copies of infringing images, and displaying those images to effectuate the sales of infringing products.

c. Alipay Labs performs the payment-processing for Alibaba's e-commerce websites and apps and handles the payment-processing for the products transacted thereon that infringed copyrights.

d. AliExpress E-Commerce is responsible for operation of the website AliExpress.com in the United States, and among other things, AliExpress E-Commerce has responsibility for facilitating the sale of the copyright-infringing products in the United States, including, without limitation, by identifying copyrighted works and designing infringing products sold in the United States.

e. In addition and in some instances, Alibaba Suppliers may also infringe copyrights and/or transact in infringing products.

## II. Alibaba's Racketeering Acts

### A. Systematic Criminal Copyright Infringement, Pirating, Plagiarism, or Counterfeiting

184. Alibaba Group, by and through the enterprise, has engaged in the racketeering act of willful, systematic, and criminal copyright infringement, pirating, plagiarism, or counterfeiting. *See* 18 U.S.C. § 1961 ("'racketeering activity' means . . . [violation of] section 2319 (relating to criminal infringement of a copyright)").

185. The acts of systematic copyright infringement, pirating, plagiarism, or counterfeiting alleged in this Class Action Complaint were willful and committed by the Alibaba Group through their enterprise, allegedly for the purpose of commercial advantage and private gain, in violation of 17 U.S.C. § 506, and Defendants are punishable, pursuant to 18 U.S.C. § 2319.

186. The instances of copyright violations alleged herein—as well as how the scheme is effectuated against members of the putative class—can be summarized as follows. Alibaba Group is the controlling entity that uses its influence over AliExpress E-Commerce and Alibaba Singapore to exert control over their business functions and how Alibaba.com and AliExpress operate. As alleged *supra*, AliExpress' and Alibaba's copyright infringement practices have been well documented and are known by the Alibaba Group. In 2020, Jiang Fan took control of the Alibaba International Digital Commerce Group and introduced a "2+4" structure (meaning two cross-border businesses AliExpress and Alibaba and four "local" businesses), focused and

concentrated Alibaba's e-commerce growth strategy, and launched full-service, semi-managed models into these businesses to effectuate further e-commerce growth.[42] And in 2022, he held a meeting with all management staff in AliExpress to advise them on the platform's direction goals and the management model that he and Alibaba Group would control.[43] This management structure—with Alibaba Group controlling, managing, and influencing control over its e-commerce platforms—allowed Alibaba Group to effectuate its copyright infringement scheme and its pattern of racketeering activity through the enterprise, as Alibaba Group allowed this activity to continue on its e-commerce platform and directed the business practices of both Alibaba Singapore and the Alibaba E-Commerce group. This included managing, overseeing, and being knowledgeable of the infringement activities on AliExpress.com and Alibaba.com.

187. Instead of stopping such practices, Alibaba Group continues to allow them to occur, despite their knowledge and control to stop them. This is because the Alibaba Group benefits directly from this infringing activity, not only in the United States by profiting off of the infringing activity, but also in China. China provides direct industrial support to Chinese e-commerce platforms, including subsidies, tax breaks, and favorable regulatory conditions, which only are secured if these Chinese e-commerce platforms continue to grow, especially across international borders.[44]

188. Given this, Alibaba Group has a vested interest in ensuring its e-commerce growth, including through a pattern of racketeering activity. Alibaba Group has directly infringed on Plaintiff's work—in fact, at least 80 of them—by using its position of control and power to direct and control the copyright infringement activities of AliExpress E-Commerce and Alibaba Singapore and by extension, the copyright infringement occurring on Alibaba.com and AliExpress.com.

---

[42] *Id.*

[43] iMedia, *Jiang Fan in the darkest hour*, https://min.news/en/tech/d8cfce43867c287fc258a836d530bdc2.html (last visited June 2, 2026).

[44] Eli Clemens, *How China's State-Backed E-Commerce Platforms Threaten American Consumer and U.S. Technology Leadership*, Information Technology & Innovation Foundation, April 2, 2025, https://itif.org/publications/2025/04/02/chinas-state-backed-e-commerce-platforms-threaten-american-consumers-us-technology-leadership/.

189. Mr. Giana never licensed, sold, or otherwise transferred any right in the copyright-registered works to the Alibaba Group, AliExpress E-commerce, Alibaba Singapore, or any Alibaba-related entity.

190. Mr. Giana is not alone: Alibaba Group (by and through AliExpress E-Commerce and Alibaba Singapore) has willfully misappropriated, pirated, plagiarized, counterfeited, or otherwise copied, marketed, offered, displayed, transmitted, and/or sold—without permission—the copyright-registered works of tens of thousands of other individuals or entities (if not more).

191. Rampant copyright infringement is not incidental for the Alibaba Group; it is crucial to their enterprise and racketeering activities.

**B. Wire Fraud**

192. Alibaba Group, by and through the enterprise, engaged in a systematic and ongoing scheme with the intent to defraud, deceive, and/or mislead the public, Mr. Giana, and the Class, whose works were infringed. Alibaba Group knowingly devised and/or knowingly participated in a scheme or artifice to defraud the victims and obtain money or property owing to the victims by means of false or fraudulent pretenses or representations, in violation of 18 U.S.C. § 1343.

193. Alibaba Group's facilitation of willful, systematic copyright infringement through AliExpress E-Commerce and Alibaba Singapore, deceptive websites, apps, and marketing methods, and other business practices alleged herein are contrary to public policy or fail to measure up to the reflection of moral uprightness, fundamental honesty, fair play, and right dealing in the general and business lives of members of society, in violation of 18 U.S.C. § 1343.

194. The Alibaba Group could foresee—and in fact, did foresee—that the interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out the scheme, within the meaning of 18 U.S.C. § 1343, as they knowingly make their infringing products over the internet.

195. Alibaba Group acting singularly and in concert, by and through AliExpress E-Commerce and Alibaba Singapore, used the interstate wires or caused the interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating

in, or carrying out a scheme to defraud the victims, within the meaning of 18 U.S.C. § 1343.

196. By way of example, Alibaba Group, by and through AliExpress E-Commerce and Alibaba Singapore, specifically used the interstate wires or caused the interstate wires to do the following:

a. Willfully infringed at least 80 copyright-registered works owned by Mr. Giana;

b. Displayed the infringing works, including, without limitation, those of Mr. Giana, for viewing and commercial gain on Defendants' e-commerce websites and apps; and

c. Sold the misappropriated and stolen works on Defendants' websites or apps.

197. All of the wire communications described above crossed interstate or international borders by reason of the technology used to transmit the communications, namely the internet.

198. It is not possible for Mr. Giana to plead with particularity all instances of wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars are within the exclusive control and within the exclusive knowledge of Defendants and other presently unknown individuals. For example, each infringing design or artwork that is described herein was more than likely viewed hundreds or thousands of times while being sold on Alibaba's e-commerce websites and mobile apps. The analytical data that would establish the who, what, and where relating to each time an infringing design was viewed or sold is information within Alibaba's exclusive control. That analytical data is not available to Mr. Giana, but Alibaba should be able to produce such data in response to Plaintiff's discovery requests.

199. Each and every use of interstate wires alleged above was committed by Defendants with the specific intent to defraud the victims and obtain money or property owing to the victims by means of false or fraudulent pretenses, representations, or promises. Defendants' acts of wire fraud, in violation of 18 U.S.C. § 1343, constitute racketeering activity, as defined by 18 U.S.C. § 1961.

## CLASS ACTION ALLEGATIONS

200. Mr. Giana brings this class action for damages and injunctive relief under Federal Rules of Civil Procedure ("Rule") 23(a), 23(b)(2), and 23(b)(3), in connection with Defendants' alleged serial, systematic copyright infringement and RICO violations, and in the alternative, to litigate common issues under Rule 23(c)(4).

201. Specifically, Plaintiff brings this action on behalf of the following "Damages Class":

> All persons and/or entities who owned a U.S.-registered copyright that was utilized by Defendants in a product(s), service(s), or tool(s) within the applicable statute of limitations period.

202. The following people or entities are excluded from the Damages Class: (1) any Judge or Magistrate presiding over this class action, members of their staffs (including, without limitation, judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Mr. Giana's counsel, Defendants' counsel, and non-attorney employees of their firms; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) any person or entity who licensed and/or otherwise expressly transferred an interest in a copyright to Defendants, as to those licensed or transferred works.

203. The Damages Class is expressly limited to copyright-registered owners.

204. In addition, Plaintiff brings this action on behalf of the following "Injunctive-Relief Class":

> All persons and/or entities who owned or own a copyright that was or is being utilized by Defendants in a product(s), service(s), or tool(s) within the applicable statute of limitations period.

205. The following people or entities are excluded from the Injunctive-Relief Class: (1)

any Judge or Magistrate presiding over this class action, members of their staffs (including, without limitation, judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Mr. Giana's counsel, Defendants' counsel, and non-attorney employees of their firms; (6) the legal representatives, successors, and assigns of any such excluded persons; and (7) any person or entity who licensed and/or otherwise expressly transferred an interest in a copyright to Defendants, as to those licensed or transferred works.

206. The Damages Class and the Injunctive-Relief Class are referred to jointly as the "Class."

207. Alibaba engages in pervasive, systematic copyright infringement.

208. Defendants' conduct as alleged herein both directly infringes and encourages, facilities, and allows for the systematic, pervasive copyright infringement of Mr. Giana and the Class members' copyright-protected works by Defendants and/or Defendants' suppliers.

209. It is not that Alibaba's conduct is isolated or that Defendants are simply ignorant of the fact that they or their suppliers are committing copyright infringement. And it is not that Alibaba engages in accidental or individually focused, sporadic, or unique instances of infringing a single victim's copyrighted work; instead, Alibaba systematically infringes victims' copyrighted works *en masse*. Widespread and willful copyright infringement is baked into Alibaba's business model.

210. In connection with Alibaba's suppliers, allowing suppliers to advertise and have Alibaba sell the copyrighted works is a feature of Alibaba's e-commerce strategy. Alibaba willfully allows this continued copyright infringement to occur on its e-commerce platforms, websites, and apps because Alibaba financially benefits through commissions and other fees when its suppliers use Alibaba to sell their products.

211. Defendants' years-long, pervasive, serial, systematic, and widespread copyright infringement has been willful, not merely the result of ignorance of copyright infringement. Alibaba has been and is aware that it and its suppliers' deliberately copying, displaying, infringing, counterfeiting, pirating, plagiarizing, or stealing of copyrighted works and selling products that infringe copyrights results in pervasive copyright infringement.

212. **Numerosity.** While Mr. Giana does not know the exact number of Class members, in part due to Defendants' efforts to conceal their business practice of overseeing and committing serial copyright infringement, there are likely tens of thousands—or even hundreds of thousands, if not more—members in each of the Damages Class and Injunctive-Relief Class throughout the United States. The size of the Class and dispersion of Class members, combined with Class members being unable to sue individually, demonstrate that joinder of all Class members is impracticable.

213. **Typicality.** Mr. Giana's claims are typical of those of the Class members. Mr. Giana and Class members were all injured by the same pervasive, serial, systematic, and widespread conduct of Defendants: copying, marketing, offering, displaying, transmitting, counterfeiting, pirating, plagiarizing, or selling their copyrighted works directly by Alibaba and/or Alibaba providing its suppliers the means and opportunity to have Alibaba sell products that infringe copyrighted works, all without attribution, permission, or licensing, having designed a system that encourages such conduct to pervade on Alibaba's e-commerce platforms, websites, and apps.

214. Mr. Giana's experiences are similar to those of the Class members: he has not licensed the copyrighted works alleged and exhibited here to Alibaba or Alibaba suppliers; this did not spare his original works from being fully copied, marketed, offered, displayed, transmitted, counterfeiting, pirated, plagiarized, or sold by Alibaba or Alibaba suppliers (while Alibaba turned a blind eye and even encouraged the practice again and again); and Mr. Giana's copyrighted works were fully copied and infringed. Mr. Giana will fairly and adequately protect and represent the Class members' interests. His interests are not in conflict with their interests; instead, Mr. Giana

and Class members share the same interests in putting a stop to Defendants' systematic copyright infringement, profiting from its rampant spread, and obtaining redress for harm that Defendants have already caused.

215. **Adequacy.** Mr. Giana will fairly and adequately protect and represent the Class members' interests. Mr. Giana's interests are not in conflict with the Class members' interests; rather, Mr. Giana and Class members share the same interest in putting a stop to Defendants' practice of systematic copyright infringement on their e-commerce websites and apps, profiting from its rampant spread, and obtaining redress for the harm that Defendants have already caused.

216. Mr. Giana is represented by counsel with experience in prosecuting class actions and in pursuing the claims alleged here.

217. **Commonality and Predominance.** Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members because Defendants' conduct of committing its own systematic copyright infringement and of turning a blind eye—and even encouraging—its suppliers' systematic copyright infringement both cause the same type of harm to each Class member, as it does to Mr. Giana, and this warrants an award of statutory damages on behalf of Mr. Giana and the Damages Class members and injunctive relief on behalf of Mr. Giana and the Injunctive-Relief Class members. Defendants systematically infringed copyrights, thus causing the same type of harm to Mr. Giana and each Class member.

218. Questions of law and fact common to the Class include the following, without limitation:

a. Whether Defendants committed systematic copyright infringement;

b. Whether Defendants systematically copied pictures, drawings, paintings, images, patterns, designs, or other works created by Class members;

c. Whether Defendants' reproduction, display, or distribution of pictures, drawings, paintings, images, patterns, designs, or other works created by Class members violated the copyrights of Class members;

d. Whether Defendants attempted to use any effective means to prevent

copying of works created by Class members;

e. Whether Defendants created e-commerce websites or apps allowing, encouraging, or turning a blind eye to Alibaba suppliers to sell products that infringe on copyrighted works;

f. Whether Defendants—with knowledge that Alibaba suppliers were offering products that directly infringed on protected works—ignored the rampant copyright infringement on its websites or apps;

g. Whether Defendants' practice of allowing Alibaba suppliers to reproduce, display, distribute, or sell pictures, drawings, paintings, images, patterns, designs, or other works created by Class members violated the copyrights of Class members;

h. Whether Defendants attempted to use any effective means to prevent Alibaba suppliers from copying copyrighted works created by Class members and selling products that infringe those copyrighted works;

i. Whether Defendants' alleged systematic copyright infringement violates RICO;

j. Whether Defendants' alleged wire fraud violates RICO;

k. Whether the Court should enjoin Defendants' conduct because it has caused and will continue to cause harm, unless enjoined;

l. The scope of any such declarative or injunctive relief, including, without limitation, whether further equitable relief is warranted to remedy Defendants' systematic infringement;

m. Whether statutory damages apply; and

n. Whether Defendants' infringement was committed willfully, such that increased statutory damages per work infringed are appropriate.

219. For example, unless Alibaba has purged data in a gambit to avoid liability, Defendants possess at least the following information, which minimizes the force of any potential

individual issues: (i) the category and sub-category of products sold on Alibaba's e-commerce platforms; (ii) the names of the products, including, without limitation, the brand, model, and relevant keywords; (iii) a detailed description of the products, including, without limitation, features, functions, and conversion-oriented benefits; (iv) images of the products; (v) information related to the Alibaba supplier of each product, including, without limitation, all information provided when the supplier signed-up to open a store on one of Alibaba's e-commerce websites; (vi) the source of all products and images of products that Alibaba itself sold; (vii) the sources from which Alibaba or Alibaba's suppliers' algorithms or other systematic methods (whether digital or not) extracted the copyrighted works; (viii) the points and times at which such copyrighted works were identified and transmitted to be used on infringing products; (ix) the instances where the infringed works were sold; (x) the consumer's name, order, shipping date, and location for each purchase of infringed work; and (xi) the price at which each infringed work was sold. The pervasive, serial, systematic, and widespread nature of Defendants' alleged copyright infringement, Defendants' information in their possession, custody, or control, and a streamlined system for each class member to submit their registered copyright, their copyrighted work, the infringing work, and that they did not license the work to Defendants or Alibaba's suppliers (all demonstrated through readily available documents submitted to a claims administrator) all blunt the force of any purported individual questions of fact or law.

220. The question of whether the works were licensed to Defendants or their suppliers does not create individual issues that predominate over common ones because Defendants have possession, custody, or control of documents demonstrating whether the works were licensed or otherwise transferred to them. Defendants and their suppliers know how they acquired the works or who licensed or otherwise transferred it to them—or from whom they infringed the works.

221. Alibaba knows which works were copied because identifying and cataloging these works is essential to their business operations. Defendants cannot claim ignorance about which designs were taken when their business model depends on systematically tracking trending designs, converting them to products, and fulfilling customer orders. The same systematic tracking

that enables Defendants to operate their high-volume copying scheme will enable identification of Class members whose works were infringed.

222. Alibaba's own business needs require it to create and maintain exactly the type of objective records that will allow Class members to be identified without individualized inquiry into the merits of each claim. Class members need only to match their copyrighted work against Defendants' databases using the same image recognition and hashing technology that Defendants themselves employ.

223. Since the Damages Class is limited to copyright owners of registered works and who did not license their works to Defendants or their suppliers, along with Defendants' alleged copyright infringement having been pervasive, serial, systematic, widespread, and willful, any speculative and purported individual questions of fact or law that may revolve around substantial similarity are irrelevant here, since the alleged copyright infringement includes flagrant copying of copyrighted art, images, and designs. The infringing works are direct copies, plagiarism, pirating, or counterfeit; substantial similarity is not at play.

224. Mr. Giana alleges that copyrighted works are identified through systematic methods and willfully copied, marketed, offered, displayed, transmitted, and sold by Defendants and Defendants' suppliers, passed off as their own work without licenses or attribution on Defendants' e-commerce platforms, and/or that Defendants turn a blind-eye and even encourage copyright infringement through lax enforcement and toothless punitive measures to stop its practice. The Damages Class is limited to registered copyright holders who have not authorized, licensed, transferred, or in any way permitted Defendants or their suppliers to use or exploit their copyrighted works.

225. **Superiority.** Allowing this suit to proceed as a class action is superior to any other available method for fairly and efficiently adjudicating this controversy. By proceeding as a class action, this action will resolve all similar claims involving Defendants' unlawful use of a common mechanism for infringement of copyrights of Class members, thus eliminating the possibility of repetitive litigation.

226. In addition, a class action is the only practical means for remedying Defendants' unlawful, serial infringement of Class members' copyrights, as Class members have neither the time nor resources sufficient to bring their own individual lawsuits against Defendants. The Class consists of copyright owners who do not have the resources, funds, or time to go after companies as herculean as Alibaba: when Defendants copy, market, promote, offer, display, transmit, sell, or facilitate the sale of products that infringe copyrights, it is highly likely that the infringement will either go unnoticed—because Class members may not have the resources to comb the web for infringement—or it will not lead to litigation, due to the prohibitive costs of individual actions. Because many of the products appearing on Alibaba's platforms sell in relatively small quantities, many Class members are likely unaware of Alibaba's infringement of their copyrights. Many Class members only become aware of Alibaba's infringement because they are fortunate (or unfortunate) enough that friends, fans, or customers spot a knockoff on an Alibaba e-commerce website or app.

227. And even for a Class member who is aware of Alibaba's infringement, the Class member is unlikely to have sufficiently large actual or statutory damages claims to warrant paying an attorney to bring the Class member's own claims in an individual suit. Thus, any decision preventing this case from proceeding as a class action would effectively permit Defendants to continue their systematic, widespread, harmful, and illegal infringement, safe in the knowledge that most copyright owners will be unable to seek redress for Defendants' wrongdoing.

228. Mr. Giana is aware of no significant difficulties in managing this action as a class action, rather than a series of individual lawsuits or a single lawsuit involving the joinder of thousands, tens of thousands, or even hundreds of thousands (if not more) of Class members bringing their own claims.

229. Mr. Giana alleges that he and Damages Class members would be entitled to statutory damages: Damages Class members are limited to copyright owners of registered works who did not license their works to Defendants or Defendants' suppliers, and Defendants' alleged infringement has been pervasive, serial, systematic, widespread, and willful.

230. Widespread copyright infringement is baked into Defendants' business model and

will not cease without declarative or injunctive relief.

231. Because Defendants have and continue to engage in a single, systematic course of conduct that has and continues to injure the Class as a whole, as well as its members individually, final injunctive relief is warranted against Defendants with respect to all Class members.

232. **Notice.** Plaintiff will determine and propose appropriate notice to Class members by working with a qualified notice expert and claims administrator, based on evidence learned in discovery from Alibaba's business records and information within Defendants' possession, custody, or control, among other sources.

## EFFECTS ON INTERSTATE COMMERCE

233. During the period applicable to this class action, Defendants marketed, promoted, offered, distributed, or sold products, services, or tools in an uninterrupted flow of commerce across state and national lines and throughout the United States, including by copying, displaying, counterfeiting, plagiarizing, pirating, or selling products containing copyrighted works, marketing products through the unauthorized use of copyrights owned by Mr. Giana and Class members, and allowing Alibaba suppliers to incorporate into products the copyrighted works owned by Mr. Giana and the Class members, without obtaining any licenses, authorizations, or permission to use such copyrights.

234. To effectuate their systematic copyright-infringement scheme, Defendants transmitted funds, contracts, invoices, or other types of business transactions or communications, in a continuous flow of commerce across state and national lines and throughout the United States. Every time a customer places an order on Alibaba's website or apps, Defendants use interstate electronic communications to process the transaction. These communications in furtherance of their fraudulent scheme constitute wire fraud under federal law.

235. The infringement campaign and related activities were within the flow of and had substantial effects on domestic, import, and interstate commerce.

**FIRST CAUSE OF ACTION**
**Direct Copyright Infringement Under 17 U.S.C. §§ 106, 501**

236. Plaintiff incorporates by reference all preceding allegations in this Complaint.

237. Plaintiff brings this First Cause of Action against all Defendants.

238. Plaintiff and Class members are the owners of registered copyrights in pictures, drawings, paintings, images, patterns, designs, or other works-at-issue in this litigation, and Plaintiff and Class members hold the exclusive rights to these works under 17 U.S.C. § 106.

239. Plaintiff and Class members have not assigned or transferred their rights to these works to Defendants or their suppliers, and they have not authorized Defendants or their suppliers to reproduce, distribute, display, or copy these works or make any derivative works from them.

240. Systematic means were used to find and copy Plaintiff and Class members' copyrighted pictures, drawings, paintings, images, patterns, designs, or other works.

241. Copied protected works owned by Plaintiff and Class members were reproduced, distributed, displayed, and sold on Defendants' e-commerce websites or apps in the United States, and Defendants thereby earned profits directly by infringing the copyrights of Plaintiff and Class members, in violation of 17 U.S.C. § 501.

242. Alibaba operates e-commerce websites and apps, upon which it willfully offered or sold products within the United States that infringed Plaintiff and Class members' copyrighted works.

243. And Alibaba operates marketplaces, upon which it connects buyers and Alibaba suppliers. To offer or sell products on Alibaba's e-commerce platforms, suppliers have to upload photographs of products through Alibaba. In many instances, including, without limitation, in Plaintiff's case, suppliers uploaded photos to Alibaba that contained his copyright-registered works—for example, such as on puzzles or draw-by-numbers kits. Once uploaded to Alibaba, Alibaba willfully copied those works onto its own servers or servers that it maintains for that purpose. Alibaba then willfully took those copies and displayed them publicly on its e-commerce platforms in violation of copyright holders' rights under 17 U.S.C. §§ 106(3), (5). This conduct

occurred within in the United States, as the infringing images were sent from Defendants' servers into the United States into Americans' homes that used Alibaba.com or AliExpress.com.

244. Alibaba has made and continues to make substantial money from commissions or other fees imposed on Alibaba suppliers' sales of products that infringed and continue to infringe on Plaintiff and Class members' copyrighted works.

245. Due to the injury caused by Defendants' willful and unlawful campaign of copyright infringement, Plaintiff and Class members are entitled to statutory damages and other remedies set forth below.

**SECOND CAUSE OF ACTION**
**Contributory Copyright Infringement**

246. Plaintiff incorporates by reference all preceding allegations in this Complaint.

247. Plaintiff brings this Second Cause of Action against all Defendants, in addition to or in the alternative of the First and Third Causes of Action alleged *supra* and *infra* herein, respectively.

248. Without Plaintiff or Class Members' permission, authorization, or consent, Defendants and Alibaba suppliers on the Alibaba e-commerce websites and apps have knowingly and intentionally reproduced, copied, or displayed Plaintiff and Class members' copyrighted works by manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, or selling the infringing products on the Alibaba e-commerce websites and apps, which bear Plaintiff and Class members' copyrighted works. As a result, Alibaba suppliers and other merchants on the Alibaba e-commerce platforms and apps are liable for direct copyright infringement under 17 U.S.C. § 501(a).

249. With full knowledge (constructive through Plaintiff and Class members' federal registrations or actual through Plaintiff and Class members' efforts) of Plaintiff and Class members' rights, the Alibaba Defendants have induced, encouraged, enabled, facilitated, participated in, or materially contributed to the Alibaba supplier's and other merchants' unlawful and infringing activities by providing the Alibaba e-commerce websites and apps and the Alibaba

Defendants' services relating thereto, such as, for example, shipping, marketing, advertising, payment processing, or other essential services, and Alibaba Defendants have generated significant income directly from the Alibaba supplier's and other merchants' unlawful and infringing activities.

250. Alibaba Defendants had and currently have actual and constructive knowledge of the Alibaba supplier's and other merchants' unlawful and infringing activities.

251. Despite overwhelming notice and knowledge of the Alibaba supplier's and other merchants' illegal, infringing activities, as well as of Alibaba's own inducement, encouragement, enabling, facilitation, participation in, or material contribution to the same, either the Alibaba Defendants have deliberately or recklessly disregarded notifications of such illegal, infringing, and counterfeiting activities and taken no action to remove the infringement materials or punish the infringers, or the Alibaba Defendants have otherwise been willfully blind to or consciously avoided learning about the full extent of the such illegal, infringing, and counterfeiting activities occurring on the Alibaba e-commerce websites and apps, and the Alibaba Defendants have declined to exercise their right and ability to stop the same.

252. By providing critical services—services without which Alibaba suppliers and other merchants on the Alibaba e-commerce platforms and apps could not advertise, market, promote, distribute, display, offer for sale, or sell infringing products on the Alibaba e-commerce platforms and apps—to Alibaba suppliers and other merchants, and by encouraging and incentivizing the use of the Alibaba e-commerce websites and apps by Alibaba suppliers and other merchants, the Alibaba Defendants induced, encouraged, enabled, facilitated, participated in, or materially contributed to Alibaba supplier's and other merchants' unlawful and infringing activities, including, without limitation, the reproduction, distribution, display, or sale of products bearing or otherwise utilizing copyrighted works of Plaintiff and Class members, and the Alibaba Defendants received a direct financial benefit for providing such services.

253. As a result of the foregoing, the Alibaba Defendants are contributorily liable for the infringement of Plaintiff and Class members copyrighted works by Alibaba suppliers and other

merchants on Alibaba e-commerce websites and apps that use the Alibaba Defendants' services, in connection with the reproduction, distribution, display, or sale of products that bear or otherwise utilize Plaintiff and Class members' copyrighted works.

254. As a direct and proximate result of the Alibaba Defendants' willful, knowing, and intentional contributory copyright infringement alleged herein that has already occurred, Plaintiff and Class members have suffered and are entitled to damages.

255. As a direct and proximate result of the Alibaba Defendants' continued willful, knowing, and intentional contributory copyright infringement, Plaintiff and Class members will continue to suffer substantial, immediate, and irreparable harm, in an amount as yet unknown but to be determined at trial, for which they have no adequate remedy at law. Unless enjoined, the Alibaba Defendants will continue to cause such substantial, immediate, and irreparable harm, loss, and damage to Plaintiff and the Class members.

256. Based on the Alibaba Defendants' ongoing unlawful and infringing actions alleged herein, Plaintiff and Class members are entitled to injunctive relief under 17 U.S.C. § 502.

257. And Plaintiff and Class members are entitled to actual damages already incurred, including, without limitation, the Alibaba Defendants' profits, in an amount to be proven at trial under 17 U.S.C. § 504(b), or at election, statutory damages under 17 U.S.C. § 504(c) and enhanced discretionary damages for willful copyright infringement, in addition to reasonable attorneys' fees and costs under 17 U.S.C. § 505.

**THIRD CAUSE OF ACTION**
**Vicarious Copyright Infringement**

258. Plaintiff incorporates by reference all preceding allegations in this Complaint.

259. Plaintiff brings this Third Cause of Action against all Defendants, in addition to or in the alternative of the First and Second Causes of Action alleged *supra* herein.

260. With neither Mr. Giana nor Class members' permission, authorization, or consent, Alibaba suppliers and other merchants have knowingly and intentionally reproduced, copied, and displayed Mr. Giana and Class members' copyrighted works by manufacturing, importing,

exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, or selling products on the Alibaba e-commerce websites and apps, which bear Mr. Giana and Class members' copyrighted works. As a result, Alibaba suppliers and other merchants on the Alibaba e-commerce websites and apps are liable for direct copyright infringement under 17 U.S.C. § 501(a).

261. Through Alibaba's agreements with its suppliers and other merchants or otherwise as a result of carrying out products, services, or tools relating to Alibaba's e-commerce websites and apps, which are products, services, or tools without which Alibaba suppliers and other merchants on Alibaba's e-commerce websites and apps could not advertise, market, promote, distribute, display, offer for sale, or sell infringing products on Alibaba's e-commerce websites and apps, the Alibaba Defendants had the legal right and ability to forbid, control, supervise, and stop Alibaba suppliers' and other merchants' unlawful and infringing activities occurring on Alibaba's e-commerce websites and apps. And the Alibaba Defendants were and are in the unique position of having sufficient information to specifically identify, monitor, control, and remove Alibaba suppliers' and other merchants' listings and sales of products infringing Mr. Giana and Class members' copyrighted works.

262. Despite the Alibaba Defendants having such a right and ability to forbid, control, supervise, and stop the Alibaba suppliers' and other merchants' infringing activities occurring on Alibaba's e-commerce websites and apps, and/or such alleged infringing and unlawful activity having been committed with the aid of the Alibaba Defendants' essential products, services, or tools, the Alibaba Defendants either refused and/or failed to exercise their right and ability to stop or limit Alibaba suppliers' and other merchants' unlawful infringing activities—indeed, the Alibaba Defendants even condoned and encouraged such infringing activity. And as a direct and proximate result of the Alibaba Defendants' failure to do the same, Alibaba suppliers and other merchants are continuing to infringe on Plaintiff and Class members' copyright-protected works.

263. The Alibaba Defendants have and continue to derive direct and substantial financial benefits directly from their own, and the Alibaba suppliers and other merchants', unlawful and

infringing activities.

264. At the least, the Alibaba Defendants have made and continue to make substantial money from commissions or other fees imposed on the Alibaba suppliers' and other merchants' sales of products, services, or tools that infringed and continue to infringe on Plaintiff and Class members' copyrighted works.

265. As a result of the foregoing, the Alibaba Defendants are vicariously liable for the infringement of Plaintiff and Class members' works by the Alibaba suppliers and other merchants on Alibaba's e-commerce websites and apps that use Alibaba's products, services, or tools, in connection with the manufacture, importation, exportation, advertising, marketing, promotion, distribution, display, offering for sale, or sale of infringing products, which bear or utilize Plaintiff and Class members' copyrighted works.

266. As a direct and proximate result of the Alibaba Defendants' willful, knowing, and intentional vicarious copyright infringement alleged herein that has already occurred, Plaintiff and Class members have suffered and are entitled to damages.

267. As a direct and proximate result of the Alibaba Defendants' willful, knowing, and intentional vicarious copyright infringement alleged herein, Plaintiff and Class members will continue to suffer substantial, immediate, and irreparable harm, in an amount as yet unknown but to be determined at trial, for which they have no adequate remedy at law. Unless enjoined, the Alibaba Defendants will continue to cause such substantial, immediate, and irreparable harm, loss, and damage to Plaintiff and the Class members.

268. Based on the Alibaba Defendants' ongoing unlawful and infringing actions alleged herein, Plaintiff and Class members are entitled to injunctive relief under 17 U.S.C. § 502.

269. And Plaintiff and Class members are entitled to actual damages already incurred, including, without limitation, the Alibaba Defendants' profits, in an amount to be proven at trial under 17 U.S.C. § 504(b), or at election, statutory damages under 17 U.S.C. § 504(c) and enhanced discretionary damages for willful copyright infringement, in addition to reasonable attorneys' fees and costs under 17 U.S.C. § 505.

**FOURTH CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. §§ 1962(c), 1964(c)**

270. Plaintiff incorporates by reference all preceding allegations in this Complaint.

271. Plaintiff brings this Fourth Cause of Action against the Alibaba Group.

272. The RICO person is the Alibaba Group, and the RICO enterprise consists of AliExpress E-Commerce and Alibaba Singapore, which are not named Defendants for purposes of this Fourth Cause of Action.

273. The enterprise has an existence separate and distinct from the pattern of racketeering activity, in which Alibaba Group engaged. The entities making up the enterprise, which are legally connected to the Defendant, were formed initially to be e-commerce platforms selling a wide variety of consumer products, but they have engaged in a pattern of racketeering activity through Alibaba Group's direction and control.

274. Alibaba Group directed the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c), consisting of multiple predicate acts, including, without limitation, willful infringement, plagiarism, pirating, or counterfeiting of copyrighted works for commercial advantage and private financial gain by systematically causing AliExpress E-Commerce and Alibaba Singapore to sell products incorporating Plaintiff and Class members' copyrighted works. *See* 17 U.S.C. § 506(a); 18 U.S.C. § 2319. Each instance of willful infringement constitutes a separate predicate act.

275. Alibaba Group committed additional predicate acts in the form of wire fraud, pursuant to 18 U.S.C. § 1343. With respect to wire fraud, Alibaba Group devised and executed a scheme to defraud Plaintiff and Class members by the following, without limitation:

a. Using interstate and international electronic means, including, without limitation, through the internet, to copy, display, or sell the copyrighted designs of Plaintiff and Class members;

b. Using Alibaba's e-commerce platforms to advertise, market, promote, or sell infringing products;

c. Making false representations (or allowing false representations to be made) about the origin and authorization of Alibaba suppliers' products; and

d. Using electronic communications to coordinate their infringement across multiple entities.

276. Alibaba Group committed at least two predicate acts of racketeering activity within a ten-year period. In fact, Alibaba Group committed well over several thousands of predicate acts, as tens of thousands, hundreds of thousands, or even more copyrighted works have been marketed, offered, or sold through fraudulent transactions.

277. The predicate acts constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because of the following, without limitation:

a. The acts are related to each other as part of Defendants' overarching, systematic scheme of infringing Plaintiff and Class members' copyrighted works;

b. The acts have the same or similar purposes, results, participants, victims, or methods of commission; and

c. The acts are continuous and ongoing, having occurred regularly over several years with the threat of continued criminal conduct.

278. Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injury to Plaintiff and Class members' business and property, including the following, without limitation:

a. Statutory damages;

b. Lost sales and licensing revenue;

c. Diminished value of their copyrighted works;

d. Damage to their reputation and market position; and

e. Costs of enforcement and monitoring for infringement.

279. By reason of the violations of 18 U.S.C. § 1962(c), Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**FIFTH CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § § 1962(d), 1964(c)**

280. Plaintiff incorporates by reference all preceding allegations in this Complaint.

281. Plaintiff brings this Fifth Cause of Action against all Defendants, in addition to or in the alternative of the Fourth Cause of Action alleged *supra* herein.

282. Defendants have conspired to violate 18 U.S.C. § 1962 by agreeing to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity.

283. Defendants knew that they and their co-conspirators were engaging in a pattern of racketeering activity and agreed to facilitate that pattern of racketeering activity. Each Defendant agreed that a conspirator would commit at least two acts of racketeering activity.

284. Defendants' overt acts in furtherance of the conspiracy include the following, without limitation:

a. Developing the Alibaba e-commerce websites and apps that are designed to copy, display, and sell copyrighted works;

b. Developing and deploying algorithmic and/or other systems designed to identify and copy copyrighted works;

c. Establishing the complex corporate structure to evade liability;

d. Approving, monitoring, or failing to take action against Alibaba suppliers engaging in copyright infringement;

e. Coordinating the transmission of stolen designs to manufacturers;

f. Sharing profits from the sale of infringing products; and

g. Concealing the true nature of their operations from victims and authorities.

285. As a direct and proximate result of Defendants' conspiracy, Plaintiff and Class members have been injured in their business and property, as alleged herein.

286. By reason of the violations of 18 U.S.C. § 1962(d), Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

287. WHEREFORE, Mr. Giana respectfully requests that the Court enter judgment on his behalf and on behalf of the Class by:

a. Certifying the Class defined herein to pursue damages under Rule 23(b)(3) and to pursue injunctive relief under Rule 23(b)(2), or in the alternative, to litigate common issues under Rule 23(c)(4);

b. Directing that reasonable notice of this action be given to the Class under Rule 23(c)(2), appointing Mr. Giana as Class representative, and appointing Mr. Giana's counsel as Class Counsel;

c. Declaring that Defendants' conduct constitutes unlawful copyright infringement under 17 U.S.C. §§ 106, 501, *et seq.*;

d. Entering an injunction, as provided for under 17 U.S.C. § 502, enjoining Defendants and any of their parents, subsidiaries, affiliates, employees, or agents from systematic copyright infringement;

e. Declaring that Defendants' infringing conduct constitutes willful copyright infringement under 17 U.S.C. § 504;

f. Entering judgment in favor of Mr. Giana and the Class against Defendants for statutory damages for each work of Mr. Giana and Class members that Defendants infringed, including the increased statutory damages award provided for under 17 U.S.C. § 504(c)(2), due to Defendants' willful copyright infringement;

g. Awarding Mr. Giana and the Class their costs of suit and expenses, including, without limitation, reasonable attorneys' fees, as provided for under 17 U.S.C. § 505;

h. Entering judgment in favor of Mr. Giana and the Class against Defendants for violations of RICO, 18 U.S.C. §§ 1962(c) and (d);

i. Awarding Mr. Giana and the Class treble damages under 18 U.S.C.

§ 1964(c) for Defendants' RICO violations; and

j. Granting such further damages or other relief, as is necessary to correct the widespread harm caused by Defendants' unlawful schemes, as this Court deems just.

**DEMAND FOR JURY TRIAL**

In accordance with F.R.C.P. 38, Mr. Giana respectfully demands a trial by jury on behalf of himself and the Class on all issues so triable.

Respectfully submitted,

Dated: June 11, 2026

*<u>/s/ Derrick F. Moore</u>*

Derrick F. Moore
Moore Law PLLC
1140 3rd St. NE, Suite 200
Washington, DC 20002
Phone: 202-289-7963
derrick@mooreatty.com

Justin S. Nematzadeh
NEMATZADEH PLLC
1129 Northern Boulevard, Suite 457
Manhasset, NY 11030
Telephone: (646) 799-6729
E-mail: jsn@nematlawyers.com

Wesley M. Griffith (*pro hac vice* to be filed)
ALMEIDA LAW GROUP LLC
3415 S. Sepulveda Blvd., Suite 1121
Los Angeles CA 90034
Telephone: (310) 896-5813
E-mail: wes@almeidalawgroup.com

David A. McGee (*pro hac vice* to be filed)
ALMEIDA LAW GROUP LLC
609 H Street NE, Suite 445
Washington, D.C. 20001
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

*Counsel for Mr. Giana and the Proposed Class*